## SAMUEL ENGS _vs._ JOB A. PECKHAM _et al._

A. and B. owned each a projecting wharf. These wharves were separated by a dock. B. also owned the land at the inland end of the dock. After the establishment by the state of a harbor line, running in front of the wharves, B. proceeded to fill up the dock. A. filed a bill of complaint asking that B. might be enjoined. A. claiming relief, — 1st. Because he had a private right or easement in the dock which would be destroyed by filling it. 2d. Because the fee of the dock was in the state, and filling it, if not a public nuisance, was an unlawful intrusion or purpresture which would be especially injurious to him : —

_Held_, that the bill could not be sustained.

The establishment of a harbor line in Rhode Island gives to proprietors within the line the privilege of filling out and extending their land to it.

_Query._ How far the establishment of a harbor line is an absolute grant of all within the line.

_Semble_, that only the state can proceed against a purpresture either to abate it or to prevent it.

BILL IN EQUITY to enjoin the respondents from filling a dock adjoining the complainant's wharf in Newport, and from obstructing the said dock, and access to the said wharf from the sea ; for a decree ordering the respondents to remove the obstructions already placed by the respondents in the said dock, and for general relief.

_William P. Sheffield_, for the complainant.

The complainant claims the rule by which the rights of the parties on the harbor line, in the event of the authorization of the parties to fill out to that line, to be as follows, namely : to ascertain the length of the riparian line, and the width of the lot of each riparian proprietor on that line, then ascertain the length of the harbor line, and apportion it among the several proprietors according to the width of their respective lots on the riparian line, by drawing lines from each side of these lots at the shore to the points in the harbor line to which they may fill out.   See Angell on Tide Waters, pp. 258, 259.

Long Wharf, which is the northern boundary of the inner harbor of Newport, does not extend out in a west course, but inclines to the south, and thereby creates the difference between the length of these two lines ; and if the riparian owners elect to fill to the harbor line they will have to extend in the same direction in which the Long Wharf is extended.   This will leave a dock in front of the complainant's land of about six feet in width,

which, if the respondents' views of their right to fill out to the harbor line are correct, they have no right to fill in; and the complainant has the right to have a decree requiring the respondents to remove the obstructions which they have placed in this part of the dock, even upon the respondents' theory of the case.

The complainant calls the attention of the court to the act of the General Assembly in reference to shores, &c., passed in May, 1707; and also calls attention to the fact that all of the records of the city of Newport were destroyed up to 1779.

The complainant's wharf, with slight alterations, is shown from "the Blastwitch map" to have existed since 1778, and it had the appearance of being an ancient structure as far back as the recollections of any witness now living extends.

The complainant claims title to the dock in dispute: I. By Grant. II. By Prescription.

I. By grant. "Whether the lost grant be brought in question by a special plea or by the general issue, its original, or probable existence may be proved by indirect and circumstantial evidence. It must always depend upon the circumstances of each particular case whether the evidence is sufficient to support the plea; but generally, enough must be proved to indicate a commencement of the right, and to point out the maker and circumstances of the grant.

"In a certain class of cases the easement is not referred to a grant of its own, but is presumed by law to be included in the subject matter of another grant without being expressly mentioned therein. These are cases where the easement is either substantially part of the subject granted, or especially necessary to its proper enjoyment." Phear on Rights of Water, p. 70; *Chad* v. *Tilsed*, 2 Brod. & Bing. 403; *Hill* v. *Smith*, 10 East, 476.

In *Trotter* v. *Harris*, 2 Young & Jervis, 285, it was held that a grant of a ferry franchise would be presumed after an enjoyment of thirty-five years. See also upon the general question, 1 Greenleaf Evidence, § 45, and *Jackson* v. *McCall*, 10 Johns. Rep. 379, 380; *Coolidge* v. *Learned*, 8 Pick. 504; *Melvin* v. *Whiting*, 10 Pick. 297; Angell's Tide Waters, ch. 9, p. 270, &c.; *Gould* v. *James*, 6 Cow. 369.

In *Stanley* v. *White*, 14 East, 332–40, Lord Ellenborough said : " The terms of an ancient grant now lost must be collected from the manner in which the right presumed under it has been exercised."

The use of the right is to serve as the record of its grant.

In *Holcroft* v. *Heel*, 1 B. & P. 400, the grant of a market from the crown was presumed after twenty years.

" When the uniform course of enjoyment has been with the plaintiff, the court will presume everything necessary for the support of it." 16 East, 341. In the same case Lord Ellenborough said : " When documentary evidence does not exist, we will rule in conformity with Lord Kenyon, who said that he would presume 200 deeds if necessary." Ibid. p. 339.

II. Prescription. It seems to be too well settled upon authority to admit of question that the citizen can acquire by prescription any right or franchise in the sea, or soil covered by the sea, by the exclusive occupation and enjoyment of the right for a sufficient length of time, unless the enjoyment of the right would be a public nuisance, or, in other words, an indictable offence.

It also seems to be a well settled law that a citizen can gain title by prescription to a right in common with others.

Here the complainant claims an exclusive right to bring vessels through this dock to the side of his wharf, and to have them lie there moored, or while they are loading and unloading. This claim, however, he limits to the purposes of the business carried on from his wharf, conceding a similar right to the respondents for the purposes of the business carried on from their wharf.

III. The Harbor Line Act of January, 1873. At the common law every intrusion into the public lands below high water-mark is *primâ facie* a purpresture, but every purpresture is not an indictable offence.

If there is a grant from the state for the intrusion, it is no purpresture.

Every purpresture may be abated upon information filed by the attorney general on behalf of the state. Angell Tide Waters, 200.

The question of nuisance or no nuisance is always a question of fact, to be settled upon the trial of an indictment. Hargrave Law Tracts, 85; Angell Tide Waters, 199; *Rex* v. *Ward*, 4 A. & E. 384.

These general definitions bear not only upon the Harbor Line Act, but upon both the questions of grant and prescription; for at the common law there could be neither grant nor prescription to maintain a common nuisance.

The only effect of the act under consideration, as the complainant claims, is to provide affirmatively that every person who shall fill out beyond the harbor line shall be subject to indictment; and under the maxim *expressio unius exclusio alterius,* that a person who does not build out beyond this line shall not be subject to indictment.

This leaves the state and individuals all other remedies for injuries from obstructions placed in the harbor below high water-mark which existed at the time of the passage of this act.

*Abraham Payne & John F. Tobey,* for respondents.

I. The complainant has obtained no title to what he terms the "dock in dispute" by grant.

It is admitted that there is no evidence of a grant. The argument of the complainant is, that a grant must be implied. None of the authorities cited by him sustain his position that a grant can be implied in such a case as this. On the contrary, it is clearly established by the weight of authority, that the presumption is against such a grant.

The shore between high and low water-mark is the property of the state, as appears by many of the authorities cited by the complainant. And see *State* v. *Jersey City,* 1 Dutch. 527.

The law respecting an implied grant in such a case is summed up in Tyler's Law of Boundaries, p. 35, as follows : —

" It has been questioned whether private individuals can gain a right to the soil of the sea shore, either by charter or grant, or by long continued possession."

II. The complainant has acquired no right by prescription such as he claims. See Washburn on Easements & Servitudes, 124–136, 137, 140, 164 ; *Thomas* v. *Marshfield,* 13 Pick. 246.

III. It follows that the respondents should not be enjoined from filling up the northern portion of their wharf estate as they propose, because it is a well established rule that a riparian proprietor may fill out in front of his land into tide water unless such filling creates an obstruction to navigation, and when a harbor line is established he may fill out up to that harbor line. *Rich-*

*ardson* v. *Boston*, 19 How. U. S. 263, 269; 24 How. U. S. 188; *Boston* v. *Le Craw*, 17 How. U. S. 426, 434–436; *Simmons* v. *Mumford*, 2 R. I. 172, 185; *Marblehead* v. *County Commissioners*, 5 Gray, 451; *Austin* v. *Carter*, 1 Mass. 231; *Commonwealth* v. *Alger*, 7 Cush. 74, 75, 79–81; *Wetmore* v. *Atlantic White Lead Co*. 37 Barb. S. C. 70; *Dutton* v. *Strong*, 1 Black, 1; *Bainbridge* v. *Sherlock*, 7 Am. Law Reg. N. S. 720, 726; *Haskell* v. *New Bedford*, 108 Mass. 208; *Manchester et al.* v. *Hudson* (unreported; see *infra*, p. 224).

Although this case is not reported, because it finally turned upon another question, it is a direct authority in support of the doctrine that the riparian proprietor has the right to fill out to the harbor line. The main question in that case was, whether the city owned the *flats* in front of the Hospital lot. Upon full argument, Mr. Justice Bosworth ruled that the title was in the city. But the jury disagreed. At the next trial, Mr. Justice Brayton, after full argument, ruled that the title was in the city, and there was a verdict for the defendant. At the next trial, Mr. Justice Brayton, by consent of counsel, ruled *pro forma* for the plaintiffs, and the question was taken to the full bench, and a new trial granted. At that trial Chief Justice Bradley instructed the jury as the decision of the full bench, that where a harbor line was established, the title of the riparian proprietor extended to the harbor line, and he had the right to occupy and fill up at his pleasure. The case went off upon the verdict of the jury, that the plaintiff had had more than twenty years' adverse possession. But upon the main question, of the effect of the establishment of a harbor line, there was the deliberate ruling of two judges, and finally a decision of the full bench, in favor of the doctrine for which we now contend.

The law on this subject is also carefully considered by the Supreme Court of this state in the two opinions in the case of *Clark* v. *Peckham, City Treasurer*, reported in 9 R. I. 455, and 10 R. I. 35.

IV. The complainant maintains that inasmuch as the harbor line is shorter than the riparian line, the respondents can in no event fill out in front of the whole of their wharf.

To this we reply: *First*. The respondents, the complainant, and all other riparian proprietors, except the one owning the

estate next south of Long Wharf, may so fill out; and if the owner of the last named estate is interfered with by the Long Wharf estate, by reason of its extending too much in a southwesterly direction, a controversy may arise between the owners of those two estates, but the questions therein involved do not affect any other riparian proprietor. *Second.* If the rule for filling out be as stated by the complainant, nevertheless, inasmuch as a line drawn from the northwest corner of the respondents' wharf to Long Wharf, parallel with the harbor line, is but about ten feet longer than the harbor line (see Capt. Cotton's testimony), it follows that at most the respondents are only prevented from filling in a very narrow strip just south of the complainant's line, and this not being or at all resembling the " dock," so called, which the latter by his bill seeks to have kept open, he can have no remedy in his present action.

*Sheffield,* in reply.

I. The respondents claim that " the complainant has obtained no title to what he terms the dock in dispute by grant."

This proposition the complainant denies.

The complainant showed at the hearing that his narrow wharf, known as " the Cahoon Wharf," was an ancient wharf in 1782.

That this wharf could not have been properly erected but under a grant made by legislative authority.

That grants of this character were authorized by the act of 1707.

That the record in which that grant would have been registered, and the only records in which it could have been legally registered, were destroyed in 1779.

These conceded facts prove the existence of the grant of the wharf, and the grant of the wharf carries with it the dock which was necessary for its enjoyment.

The long continued existence of the structure and of the use of the adjacent dock is evidence that it had a lawful origin, and the title to the structure and the appurtenant dock " is registered in the acts of the parties," if not elsewhere.

There is a distinction between statutes of limitations and prescription. The former limits the time within which an action may be brought to assert a right, and the latter is evidence to establish a right.

Statutes of limitations do not ordinarily run against sovereigns. But, a long unchallenged possession under a claim of right authorizes the presumption of a grant even against the state.

If it is possible that the right claimed could have been granted, and the enjoyment thereof has been from time out of mind unexplained, a grant is to be presumed.

It matters not whether the *locus in quo* was formerly a part of a highway in land or sea, in tide water, or in a factory stream.

True a man cannot prescribe against a statute that makes a new law, but he may against the common law or a statute that affirms the common law. See Doct. & Stud. p. 81, n.; 1st Instit. 115; Cro. Eliz. 125; 3 Dane Ab. ch. 79, § 8, p. 249.

Before A. D. 1300, Edward I. of England and Philip the Fair of France met all of the sovereigns of Europe of German or Roman origin, and by treaty it was then settled that the four seas belonged to England by prescription. See 1 Molloy, p. 124, 125, b. 1, ch. v. § 14.

Fitzherbert, in his Natura Brevium, p. 518, 519, I. & A. tit. " Writ of being quit of Toll," says this writ lies where any citizen, or burgess of any city, or borough, has been quit of toll throughout the realm by grant of the king's prerogative *or by prescription.* Fitzherbert was Chief Justice of the Common Pleas in 1523, and died 1538.

In 1774 it was held that a prescription for a toll upon all goods landed in a manor in consideration of keeping up a wharf was good. *Colton* v. *Smith,* 1 Cowp. 47.

A title was made from the Black Prince (Edward III.), which could not be out of him but by act of parliament; but when the possession had gone otherwise the act of parliament was presumed. Viner Abridg. tit. Evidence, § 2, p. 11 (1741).

Lord Hale, cited in Hargrave's Law Tracts, ch. 5, p. 17, says : " The king may grant the very interest: namely, a navigable river, that is, an arm of the sea, the water, and the soil thereof.

Again : " I think it very clear that a subject may by custom and usage, *or prescription*, have the true property and interest in many of the maritime interests. Ibid. p. 18, also, p. 22.

In *Read* v. *Brookman*, 3 Term Rep. 151, 159, Buller, J., says : " For the last two hundred years it has been considered as clear

law, that grants, letters patent, and records may be presumed from length of time."

It was so laid down in Lord Coke's time. As undoubted law then, and in modern times, it has been adopted in its fullest extent.

The modern American authority fully sustains and demonstrates that in this country grants may be presumed as against the public in tide waters as in England. See 1 Phil. Evidence (Cow. & Hill's Notes), p. 160; 2 Phil. Evidence (Cow. & Hill's Notes), p. 354, and n. 310, 311; 1 Greenleaf Evidence, § 45; Angell on Tide Waters, ch. 9, p. 270.

To recur to authority from both England and America. In *Rex* v. *Montague*, 4 B. & C. 598, which was an indictment for obstructing a highway, the defendant justified as the servant of a municipal corporation, and that the highway itself obstructed a navigable tidal river. The proof was that the highway had been built across the river thirty or forty years. The court said that there might have been a grant to make the highway, and from the use for this length of time left it to the jury to say if there was a grant, and the jury found for the defendant. This was in 1825, before the passage of the statute of William IV. limiting actions by the crown.

In *Orford* v. *Richardson et al.* 4 Term Rep. 437, it was determined that there might be a prescriptive right to a several fishery in an arm of the sea, and this law was not questioned or reversed.

It is said that *Bagott* v. *Orr*, 2 Bos. & Pul. 472, is to the same effect. See also *Rickards* v. *Bennett*, 1 B. & C. 223; *Pelham* v. *Pickersgill*, 1 Term R. 660; and *Nottingham* v. *Lambert*, Willes, 111, 116.

In *Carter* v. *Murcot*, Burrow, 2162, Lord Mansfield held that a person might by prescription obtain a several fishery in tide water, thus affirming *Orford* v. *Richardson* and *Bagott* v. *Orr*.

If these cases are good law, why cannot a citizen acquire a several right in a dock?

In *Beardslee* v. *French*, 7 Conn. 125, it was held that the non-user of a part of the highway inclosed by an abutting proprietor is *primâ facie* evidence of a release of the public right.

*Alves, &c.* v. *Town of Henderson*, 16 B. Monroe, 131, is to the

effect that the several use of a part of the highway for twenty years is evidence of a right to use it as against the public. So a grant of a right of ferry as against the public was presumed after twenty years' use. See also *County of Susquehanna* v. *Deans,* 33 Pa. St. 131; *Spear* v. *Bicknell,* 5 Mass. 125.

In *Inhabitants of Arundel* v. *McCulloch,* 10 Mass. 70, when the limit for a writ of right was sixty years, the court conceded that the right to bridge a navigable river, tide water, might be acquired by prescription, but that sixty years was necessary to presume a title against the public. See also *Charles River Bridge* v. *Warren Bridge,* 7 Pick. 344, 448, 483.

II. Lord Hale says (Hargrave Law Tracts, as above) : " The owner of land bounding upon the sea or other navigable water where the tide ebbs and flows owns to ordinary high water-mark ; the soil below this belongs to the public, not subject to the interference of the crown, unless there is an individual title by grant or prescription." Again: " The sea-shore *primâ facie* of common right belongs to the king, but may be vested in a subject by grant or prescription." But such grants are to be construed *most favorably for the king or government as a trustee for the public, and strictly against the grantee.*

That an individual receiving a particular special injury from a public nuisance may maintain a suit for the abatement of, or for injuries from, the nuisance, is a proposition too familiar to admit of controversy.

The authority of Lord Hale is to the effect that title in tide waters may be acquired by an individual either by grant or prescription, and that grants from the public are to be construed favorably to the public and most strongly against the grantee.

There are no words making an express grant in the Harbor Line Act, and none from which a grant can be implied without doing violence to the principle that a grant from the public is to be construed most favorably to the grantor.

Full effect can be given to every word in the Harbor Line Act by construing it to mean, that whereas at the common law every intrusion into the public waters was *primâ facie* a nuisance, that this act conclusively fixed a line within which this presumption should not attach.

This would leave any intrusions into the tide waters within the

harbor line to be a mere purpresture, and not to be a public nuisance, and this presents the question whether a purpresture may not amount to a private nuisance?

A purpresture may or may not amount to a public nuisance. If it amounts to a public nuisance, it may be proceeded against by indictment; but if it fails to amount to a public nuisance, or even if it is a public nuisance, it may be proceeded against by information in equity and be abated, — that is the purpresture may be removed. See *Attorney Gen'l* v. *Cohoes Co.* 6 Paige, 133; *Attorney Gen'l* v. *Johnson,* 2 Wilson Ch. 87; *Attorney Gen'l* v. *Richards,* 2 Anstr. 603.

If the state should merely release or forego its remedy by indictment, this act would not affect the remedy of a private individual for a special injury occasioned by the purpresture to the public right, which was especially advantageous to the individual.

If the title to this dock remained in the public, and the plaintiff had no vested right therein, the legislature, representing the public, could undoubtedly grant the right to fill the dock to the defendant or to any other person, certainly to the defendant.

III. Has the legislature done this?

Full effect may be given to every word in " the Harbor Line Act," by construing it to operate as a release from indictment of those persons who may place obstructions within that line.

The act contains no grant, and in it no words expressing any intention to make a grant of any estate are contained.

It is, as we have already seen, a rule of law that public grants are to be construed most favorably to the grantor; for being made by a trustee for the public, no alienation should be presumed that is not clearly expressed. *Minturn* v. *Larue,* 1 McAl. 370.

In the absence of any judicial decision the interpretation of the Harbor Line Act of January, 1873, would seem to be that which I have here indicated, and it remains to be seen if there has been any decision which would modify this conclusion. The case of *Simmons* v. *Mumford,* 2 R. I. 172, quoted in the defendant's brief, arose under the act relative to the harbor and public waters of the town of Providence, passed October, 1815.

The first section of that act authorized the town to make rules and regulations for the preservation of the harbor from encroachments.

The second section adopted reports of committees and action of the town made and had on the 13th and 24th days of July, and on the 29th day of August of that year, which ascertained and defined the bounds of said harbor, and with a slight modification established the same as the boundary of the harbor.

The act of A. D. 1822, related exclusively to the cove above Weybosset Bridge, and prohibited any erection below high water-mark without the consent of the board of aldermen of Providence.

The acts of October, 1851 and of January, 1855, were re-surveys of the harbor line established in 1815, and embracing a slight modification thereof.

The act of January, A. D. 1855, authorized the city council to establish a harbor line on the west side of Providence River, from Dorrance Street to Sassafras Point.

The act of 1865 establishes a harbor line from Fox Point to the railroad bridge at India Point, and confers upon the city council of Providence full authority in relation to filling in the land within the harbor line.

The act of January, 1870, confers upon the city council of Providence authority to establish a harbor line on the west side of Seekonk River, and to make conditions and regulations with reference to filling in within the harbor line.

The act of January, A. D. 1872, in reference to the harbor line between Sassafras Point and Field's Point, is like the acts of 1865 and 1870.

The legislature of this state has repeatedly asserted the title of the state to lands covered by tide water to high water-mark, and if this state claim is not groundless, there is no local law here which modifies the old common law.

I therefore conclude : —

1. That Samuel Engs and his ancestors in title had the right to this dock by grant as an incident to his wharf, made by the town of Newport, under the act of 1707, a record of which grant was destroyed with the records of the town of Newport in 1779, and that this grant is evidenced by the necessity of the dock as an incident to the wharf, and by a prescription which extends back beyond the memory of man.

That this vested title cannot now be divested by the legislature, but in the exercise of the right of eminent domain upon compensation to Engs.

2. That the Harbor Line Act of January, 1873, for the city of Newport, releases no title of the state to any of its lands within the line established by that act.

I do not understand that the respondents make any claim which is entitled to a moment's consideration to fill that part of the dock which is (in the event of the Harbor Line Act being construed to give them the right to fill, within the harbor line in front of their premises) properly apportionable to the complainant's premises. At all events the complainant is entitled to an injunction, and for a decree to remove the obstructions in so much of the dock as is apportionable to the front of his land. But the complainant confidently claims that he is entitled to the full relief which he prays for as against the entire obstructions which the respondents have placed in this dock.

*Providence, August* 4, 1875. DURFEE, C. J. The complainant is the owner of an ancient wharf in Newport, called the Cahoone Wharf. The respondents are owners of the wharf next south, called the Freebody Wharf. There is a dock or open space of water between the two wharves, which has been long used for access to both wharves, and especially for access to the Cahoone Wharf, which, on account of its narrowness, does not furnish convenient facilities on its front for lading and unlading vessels. The respondents own the land at the head of this dock or open space of water. An act establishing a harbor line in the public waters of Newport was passed in 1873. Since the establishment of the harbor line, which runs in front of the dock and wharves, the respondents, claiming the right so to do, have commenced to fill the dock. The complainant brings this bill to have the respondents enjoined from so doing, and to have them ordered to remove the obstructions already placed in the dock, and for general relief.

Evidence adduced at the hearing shows that the Cahoone Wharf has existed from a period beyond the memory of living witnesses. It is mentioned in a deed of the date of 1782. It was conveyed to George Engs in 1842. Benjamin Finch testifies that he has known it for fifty years; that when he first knew it the front end was broken down and dilapidated, and landing was effected on the south side; that Engs fitted it up and landed on the south side, end, and north side; that the owners of the

wharf used the dock at pleasure, their right to use it being until recently undisputed. He also testifies that thirty years ago, Newport wharves were of little value, most of them being down. Similar testimony is given by other witnesses. George B. Hazard testifies that the end of the wharf was too narrow to land at. Samuel Engs, the complainant, testifies that he understood the dock was a part of the public waters and he had a right to use it. Evidence for the respondents shows that many years ago the dock was in use as a landing-place for a horse- or ferry-boat.

The counsel for the complainant contends, that we ought, on this evidence, to presume a grant from the town of Newport, as the agent of the state, or under the act of 1707, to the complainant's predecessors in title, of a right to build and maintain the wharf, and to use the dock in connection with it. He contends that we can so presume in the absence of any record, upon the supposition that the record has been lost, and that the supposition of loss can be readily made, because the records of Newport were totally destroyed in 1779.

We do not care to speculate in regard to the origin of the Cahoone Wharf. We will assume that it has always rightfully existed. The difficulty is in the complainant's claim to the adjoining dock. His counsel contends that a grant of the wharf would carry a right in the dock, because, without the dock, the wharf would be valueless. There would be force in this argument if the dock were the private property of the grantor of the wharf. The dock was a part of the public waters of the state. The grantee of the wharf would have a right to use the dock without any grant. It is not necessary, therefore, to imply, as incident to a grant of the wharf, the grant of any private right to use the waters adjoining the wharf, and without necessity the implication will not be made. Indeed, the complainant says he understood the dock was a part of the public waters, and he had a right to use it.

It is equally difficult to support the complainant's claim as a claim by prescription, even if we may admit his claim could be so established. The dock, we repeat, is a part of the public waters. As such the complainant and his predecessors have always had a right to use it. Mere use of it, therefore, however long contin-

ued, is no evidence of any right to use it beyond the right belonging to them in common with the rest of the public. To establish a private or peculiar right in them, it would be necessary to show a use to the exclusion of the public, or in derogation of the public right, or, in other words, a long continued or immemorial use enjoyed under circumstances implying a grant of some private or peculiar right to use it. There is no evidence which satisfies us that there has been such a use. Indeed, as we have seen, the complainant himself understood the dock was a part of the public waters and he had a right to use it, meaning, as we understand the implication, he had a right to use it *because* it was a part of the public waters.

The complainant claims a right to maintain his bill, even if he has no private easement in the dock, because as owner of the Cahoone Wharf he will suffer a special injury by the filling up of the dock. The complainant would be entitled to relief on this ground, if the filling up of the dock were a public nuisance. The respondents contend that it is not a public nuisance, but that under the Harbor Line Act they have the right to fill and occupy the water in front of their land out to the harbor line. The complainant replies that the Harbor Line Act contains no grant of the soil between the shore and harbor line, and that its only effect is to abolish the remedy by indictment for obstructions placed within the line. The act does not contain any word of grant. It establishes and defines the line, and prescribes a penalty or forfeiture, to be recovered by indictment, for obstructions created outside of it. It does not in terms abolish any of the common law remedies for obstructions created within the line. It is not claimed, however, that the act has no other effect than to prescribe a statutory penalty for obstructions committed outside the line established by it. The simple establishment of the line has a meaning of itself, and would still have a meaning, even if the provision in respect to obstructions committed outside the line were totally omitted. The question, then, is, What does it mean? At common law the erection of a wharf in tide waters is not indictable as a nuisance unless it obstructs navigation. In this state this doctrine has been liberally applied for the benefit of riparian proprietors. Such proprietors have been very freely permitted to erect wharves, and even to make new

land by filling the flats in front of their land. We are not aware that the state has ever laid claim to any wharf so built, or any land so made, unless the cove lands filled by the city of Providence can be considered an exception. Our harbor line acts are to be construed in the light of this doctrine and practice. The establishment of a harbor line, when so construed, means that riparian proprietors within the line are at liberty to fill and extend their land out to the line. A harbor line is in fact what it purports to be, the line of a harbor. It marks the boundary of a certain part of the public waters which is reserved for a harbor. The part so reserved is to be protected from encroachments. The rest is to be left to be filled and occupied by the riparian proprietors. Its establishment is equivalent to a legislative declaration that navigation will not be straitened or obstructed by any such filling out.

The counsel for the respondents refers to the case of *Manchester* v. *Hudson*,[1] and says Chief Justice Bradley in that case instructed the jury as the decision of the full bench, that where a harbor line is established, the title of the riparian proprietor extends to the harbor line, and he has a right to occupy and fill up at his pleasure. Upon this point the case never came before the court *in banc*. We presume Bradley, C. J., may have conferred with his associates, and that he gave instructions appropriate to the trial. We think, however, it would be going too far to hold that the mere establishment of a harbor line conveys all within the line absolutely to the riparian proprietors. This would make all within the line private property, and extinguish the public rights of navigation and fishery. We think the establishment of a harbor line, if it is to be construed as a conveyance, is to be construed as a conveyance which at least is subject to those rights, until they are excluded by filling or wharfing out. But it is not necessary for us to go even so far as that in the case at bar. It is enough for the respondents if we hold that the establishment of a harbor line operates as a license or invitation to the riparian proprietor to fill or wharf out to that line. We think it

---

[1] See Records Supreme Court, Providence Co. vol. 22, pp. 19, 14. Declarations, No. 1899. Exceptions, No. 245. Oct. Term, 1867. See also *ante*, p. 214.

has at least such an effect. Whether the riparian proprietor, who has filled or wharfed out, has as against the state the same absolute dominion over the wharf and new-made land as over his upland, is a question which we need not now determine.

We have said that in our opinion the Harbor Line Act is a good defence to the complainant's bill if it can be construed as a license or invitation to the riparian proprietors to fill or wharf out to the harbor line. We think so for this reason. The complainant seeks to maintain his bill on two grounds : 1st. Because he has a private right or easement in the dock which will be destroyed by filling it. 2d. Because the fee of the dock is in the state, and filling it, if not a public nuisance, is an unlawful intrusion or purpresture which will be especially injurious to him. We cannot maintain the bill on the first ground, because we do not find that the complainant has any private right or easement in the dock. And we cannot maintain the bill on the second ground, because if the respondents have the license or invitation of the state to fill or wharf out, it will be no nuisance and no unlawful intrusion or purpresture for them to accept the license or invitation and fill the dock. The complainant can no more complain of an act done in the dock by the respondents under the license or upon the invitation of the state, than he could complain of the same act if done by the state itself. Indeed, we do not very well perceive how any party except the state could proceed against a mere purpresture either for the purpose of abating or preventing it.

The complainant claims a partial relief on still another ground. He says the respondents purpose filling out at greater width than they are entitled to fill out upon a just apportionment, the harbor line being shorter than the shore line. This claim, if it can be made on the bill as framed, raises a question which we prefer not to dispose of without further hearing. We will let the case stand for further hearing if the parties desire it.