NEWPORT REALTY, INC.

v.

**Patrick LYNCH, in his capacity as Attorney General of the State of Rhode Island.**

No. 2003–363–Appeal.

Supreme Court of Rhode Island.

July 20, 2005.

G. Quentin Anthony, for Plaintiff.

Michael L. Rubin, Providence, for Defendant.

Present: WILLIAMS, C.J.,
GOLDBERG, FLAHERTY, SUTTELL,
and ROBINSON, JJ.

## O P I N I O N

GOLDBERG, Justice.

This case takes us to the historic Newport harborfront. Long before the "City–by–the–Sea" became famous as a tourist destination, Newport's harbor was the focal point of the community and largely responsible for its rich merchant history. Because of its deep and well-protected harbor, Newport was a thriving commercial port, one of the busiest in the Colonial era. Wharves stretched for up to a mile, where hundreds of merchant ships, including vessels employed in foreign and domestic trade, were moored to land and load goods and supplies. Colonial Rhode Island's thriving economy depended on Newport harbor:

> "The ports of Boston and New York were far behind Newport, in the State of Rhode Island, in the value of their imports; and that small State was paying all the expenses of her government by the duties levied on the goods landed at her principal port. And so reluctant was she to give up this advantage, that she refused for nearly three years after the other twelve original States had ratified the Constitution, to give it her assent." *Cook v. Pennsylvania,* 97 U.S. 566, 574, 24 L.Ed. 1015 (1878).

This appeal concerns a wharf in Newport harbor (Wharf) and the streets or ways on the structure, currently identified as Commercial Wharf, North Commercial Wharf, and Scott's Wharf.

Of ancient origin, this Wharf runs perpendicular to America's Cup Avenue, near

the Memorial Boulevard Extension; it is the site of the Harbourview Condominiums (formerly the General Electric Building) and the "Newport Yachting Center," where the annual Newport Boat Show is held. Located on the Wharf is a grid of streets and roadways, irregular in length, running along the length of the Wharf; at one point, two roadways ran to the westernmost terminus, the harbor itself. The chain of title to the property on the Wharf dates back to the eighteenth century.

The term "wharf" connotes the actual physical structure jutting out into the harbor, to the harbor line, and also refers to the ways or streets situated on the Wharf. These roadways were known as South Commercial Wharf,[1] North Commercial Wharf, and Scott's Wharf. An unnamed way, connecting North Commercial Wharf to Scott's Wharf, characterized as a "dog leg" or the "north-south connector" (connector), also is part of this dispute. The legal status of the streets and ways is at the center of this controversy.

■ Wharves were constructed by littoral landowners by filling out to the harbor line. This Court long has recognized that the common law right of wharfing out—by filling and then improving upon the filled land—is sufficient to establish title to that land, such that the littoral owner may convey out the land he or she has so acquired. *Greater Providence Chamber of Commerce v. State*, 657 A.2d 1038, 1044 (R.I.1995). Wharfing out or the right to fill and occupy land to the harbor line remains a common law right of riparian ownership.[2] *Engs v. Peckham*, 11 R.I. 210, 223–24

(1875). "The establishment of a harbor line permits the riparian owner to carry the upland or high water mark out a certain distance from the natural shore." *Allen v. Allen*, 19 R.I. 114, 116, 32 A. 166, 167 (1895). "The land which was formerly shore becomes upland and while the rights to shore and upland are not changed, they are carried further out into the tidal stream, or sea." *Id.* (citing *Engs*, 11 R.I. at 224).

## Facts and Travel

This is an action to quiet title. The plaintiff, Newport Realty, Inc. (Realty or plaintiff), is a real estate holding company, located in Newport, and is the record owner of the fee in the property that abuts the streets on the Wharf. The City of Newport and Harbourview Condominium Association (Harbourview) were named defendants, but they are not before this Court on appeal.[3] The plaintiff filed an action to quiet title to the streets and ways on the Wharf. By virtue of its ownership of the land that borders North Commercial Wharf, Scott's Wharf, and the connector, Realty claims ownership of the streets and ways on the Wharf. Realty argued that the roads were private rights of way intended for the benefit of the lot owners, and as the sole owner of all the previously platted parcels, Realty owned the fee in the roads.

Appended to the complaint and discussed at great length at trial is a report of Donato Andre D'Andrea (D'Andrea), an attorney and title examiner who testified as an expert witness during plaintiff's case

---

1. The record discloses that a portion of South Commercial Wharf was deeded to the City of Newport (but not to the harbor as it was depicted on the First and Second Ebbs Plats) and is now known as Commercial Wharf. *See infra.* The parties do not dispute that Commercial Wharf is a public roadway.

2. Many of these rights are now subject to state regulation.

3. Harbourview is situated on Commercial Wharf and has a right of way for travel in North Commercial Wharf.

in chief. D'Andrea's report and testimony present a comprehensive history of the many conveyances of the Wharf and the parcels to the east that terminated at Thames Street, but now end at America's Cup Avenue, and at the western terminus of the Wharf, Newport Harbor. According to the report, "the way that became North Commercial Wharf first appears in 1832 and extends from Thames Street to a distance no further west than 258 feet west of Thames Street."

A series of conveyances, beginning in 1898, by John N.A. Griswold of "all his wharf property to Mary Byrd Derby" are relevant to the issues before this Court. According to D'Andrea, with the exception of the property that fronted onto Thames Street, this series of transactions assembled the Wharf property into common ownership. D'Andrea testified that the lots on Thames Street had gaps between the buildings that provided access to the Wharf properties westerly to the harbor. In such a case, a buyer of Wharf land would be deeded a right of way to Thames Street. Beginning in 1898, Mary Byrd Derby and her husband, Richard C. Derby (the Derbys), began to acquire properties on Commercial Wharf, ultimately assembling the Wharf into a single, large lot. Critical to the Derby acquisitions was that Mary Byrd Derby also owned an interest in property that fronted on Thames Street.

According to D'Andrea's report, Mary Byrd Derby conveyed her interest in her Thames Street property to the Newport Trust Company. On the same day, she was deeded, *in fee*, a ten-foot strip of land on South Commercial Wharf, extending from her "Commercial Wharf estate, so[-]called," to Thames Street "for purposes of a way to be used by all persons having occasion to go from Thames Street to the Commercial Wharf estate." Although the deed restricted the use of this parcel to ingress and egress from Thames Street to the Wharf, the record discloses that Mary Byrd Derby owned the entire Wharf and a ten-foot strip of land to Thames Street. When she conveyed her property, the conveyance included this ten-foot strip of land.

In 1912, the Derbys conveyed all their Wharf property to the Providence, Fall River and Newport Steamboat Co. (steamboat company). According to D'Andrea, the grantor treated the property as a single parcel and filed a plat plan with the deed. The property is depicted on the plat as a single parcel, bounded on three sides by the harbor; included in the deed description was a reference to Scott's Wharf "being a way running westerly from Thames Street." The ten-foot strip of land out to Thames Street was included in the conveyance; the deed recited the restriction limiting the use to access to the Wharf:

> "Together with all the rights of way in and to ways leading to or from said premises and subject to whatever rights of way the said Newport Trust Company may have in and to the way leading westerly from Thames [S]treet on the southerly side of the land of the said Newport Trust Company shown on the annexed plat. *The ten-foot strip of land at the westerly end of the land of the Newport Trust Company and shown on the annexed plat is subject to the uses and purposes as described in the deed of the Newport Trust Company to Mary Byrd Derby,* dated August 12, 1902[,] and recorded in volume 79 of the land evidence of Newport, at pages 341 to 345." (Emphasis added.)

The accompanying plat depicts unobstructed, open roadways running westward from Thames Street to North Commercial Wharf and Scott's Wharf.

### The First Ebbs Plat

In 1919, the steamboat company conveyed the entire parcel to Narragansett Bay Realty Company (Narragansett). On April 30, 1921, apparently encountering financial difficulties, Narragansett conveyed its property to a group of trustees (trustees) who were charged with selling the property for the benefit of Narragansett's creditors. The parcel at the end of the Wharf, abutting the harbor, was under lease to the steamboat company. The trustees recorded a plat plan, identified as the First Ebbs Plat, which subdivided the Wharf, with the exception of the lot leased to the steamboat company. Significantly, on this plat, South Commercial Wharf and North Commercial Wharf were depicted as running, unobstructed in any way, from Thames Street to the harbor. Scott's Wharf was set out as running from Thames Street to the connector. As depicted on the plat, these roads connect with a public thoroughfare, are not closed off by solid lines, nor is there any indication on the plat itself that these roadways are private roads. The First Ebbs Plat, filed on November 15, 1921, is the central document in this case and is appended as exhibit No. 1.

Thereafter, six deeds from the trustees to various buyers were recorded that deeded-out most of the lots on the Wharf, but not the portion leased to the steamboat company. Each deed included a description of the lot conveyed by metes and bounds and by reference to a way or street on the First Ebbs Plat. For example, lots 6 and 9 were transferred to Fischel David and were described by metes and bounds as situated "on a *way called North Commercial Wharf* laid out on [the First Ebbs Plat]." (Emphasis added.) Significantly, the First Ebbs Plat was the only reference in the deeds to roadways and rights of access to the Wharf. The deeds did not reserve or grant a right of way over the roads on the Wharf, nor did they provide for access to the Wharf from Thames Street; these issues were resolved by reference to the plat.

The state contended at trial and argues to this Court that the roads on the Wharf were public by virtue of the sale of lots by reference to the plat and the streets and ways set forth on it. The state argues that this amounts to an incipient dedication of the roads for public use and that this offer was accepted by continuous public use. We note that public use is not disputed by the parties. Realty contends that the First Ebbs Plat was not a land development plat because it reflected streets and ways that had been laid out before the plat was recorded. During the presentation of evidence, the trial justice opined that the First Ebbs Plat was "[s]ort of an occupational survey rather than [a] development survey." Realty agreed with that suggestion and now argues that the purpose of the First Ebbs Plat was "to provide a vehicle for identifying and describing the lots under the control of the trustees and facilitate their sale." The plaintiff contends that without the benefit of the history of the Wharf, before the advent of the trustees, "anyone looking at the First Ebbs Plat would have no reason to think of it as anything but another land-development plat." Realty argues that the plat "reflects lots, numbered from 1 to 10, and shows ways leading to the lots" but that "it was anything but a land-development plat, and the roads shown on the plat were not proposed lots and roads." The state counters that, because the Wharf was assembled into common ownership and conveyed as a single parcel by the Derbys, the existing rights of way were merged with the fee and that, in the First Ebbs Plat, the trustees subdivided the property into separate parcels

and sold the parcels with reference to the plat.

## The Second Ebbs Plat

If the First Ebbs Plat was the only plat plan created by the trustees, our analysis would be much simpler. However, a series of events occurring after the filing of the First Ebbs Plat and subsequent sale of the subdivided lots is relied upon by Realty to support its contention that the roads were not dedicated for public use. In sum, Realty relies upon a deed, recorded after the lots were sold, as evidence that the trustees did not make an incipient dedication.

In January 1923, the trustees recorded an instrument described as an "Indenture" (indenture deed) along with another plat, known as the Second Ebbs Plat, appended as exhibit No. 2. The indenture deed was a conveyance between and among the trustees and the buyers of the lots as depicted on the First Ebbs Plat, including the Newport Industrial Development Company. The parties to the indenture deed are described as the owners of certain land purchased from the trustees "in accordance with and as laid out on a plat thereof entitled [the First Ebbs Plat]." The indenture deed acknowledged that "certain ways known as Commercial Wharf and North Commercial Wharf are designated and delineated on [the First Ebbs Plat] and on a plat hereunto annexed"—the Second Ebbs Plat.

The indenture deed also reflected that Newport Industrial Development Company was "desirous of erecting a building on part of the said way so designated and set forth[ ] as Commercial Wharf and on a small triangular piece of the way so designated and set forth as North Commercial Wharf." In return for a land swap to increase the size of its parcel, Newport Industrial Development Company agreed to "release an additional strip to be used as part of the way known as North Commercial Wharf" and an additional strip of land at the east end of its property. The 1923 indenture deed also contains a reservation clause guaranteeing that the land conveyed in exchange for portions of Commercial Wharf and North Commercial Wharf would remain open and be unobstructed:

> "[T]he said parcels to remain open and be unobstructed forever with the right of way of the parties of the first part [the individual lot owners and trustees] hereinbefore granted as appurtenant to the several parcels of land owned by them respectively and their several and respective heirs and assigns, as owner of said parcels, to pass and repass over the same at any and all times on foot and with horses, carriages, automobiles, teams and other vehicles."

Realty and the trial justice relied upon this deed restriction to support the conclusion that there was no dedication of the streets and ways by the trustees in the First Ebbs Plat and that the language in the indenture deed also granted a right of way to the other buyers in and to the streets and ways on the Wharf. Realty argues that this reservation was "compelling evidence of the intent of the owners when the [F]irst Ebbs Plat was recorded" and "is tantamount to a 'smoking gun.'" According to Realty, this reservation "reflects the understandings of all participating in the deed, both the trustees and their grantees, that the ways of the First Ebbs Plat were private."

The state contends that a careful reading of the entire indenture deed reveals that the reservation clause contained in the deed was limited to the areas described in the land swap and not the entire Wharf. Because the indenture deed and Second Ebbs Plat were recorded together

and the deed restriction refers to the areas set forth on that plat, the state maintains that the reservation clause only related to the small area actually traded in the indenture deed. This was confirmed by expert testimony at trial. The state's expert, attorney Alfred Thibodeau, maintained that the First Ebbs Plat remained a continuing offer of dedication of streets to the public and that the reservation of rights in the Second Ebbs Plat was limited to the areas depicted on the plat as described in the indenture deed.

### Later Events

Yet a third deed and plat were filed by the trustees and the lot owners in 1924, conveniently identified as the Third Ebbs Plat, appended as exhibit No. 3, by which the trustees, the lot owners, and the lessee, the steamboat company, deeded the underlying fee of *a portion* of South Commercial Wharf to the City of Newport. Importantly, for purposes of this analysis, this plat and conveyance did not deed out the portion of the roadway that connected to the harbor. The Third Ebbs Plat, *as indicated by broken lines and a designation of "Limit of Right of Way,"* cuts off Commercial Wharf at the property leased by the steamboat company. For the first time, the newly named Commercial Wharf was depicted as terminating at a point east of the harbor. Although not part of the conveyance depicted in the Third Ebbs Plat, North Commercial Wharf still ran to the harbor, but as depicted in previous plats, the portion that crossed the steamboat company parcel was undifferentiated. Finally, yet another connector was depicted as the new terminus of Commercial Wharf, connecting it to North Commercial Wharf. With the exception of the new terminus for Commercial Wharf, which was depicted by broken lines, the streets on the Wharf clearly were set forth by solid lines. As noted, Commercial Wharf

is not part of this dispute. *See* note 1, *supra.*

All the remaining lots were conveyed by the trustees, and each deed referenced the First Ebbs Plat and the streets and ways delineated on it. The final lot conveyed, in January 1925, was the steamboat landing at the end of the Wharf. The parties agree that the lease to the steamboat company had expired and the harbor-facing parcel that had been reconfigured in the Third Ebbs Plat was sold to the Progressive Land Company. At this point, the trustees, their work completed, withdrew from the waterfront.

The trial justice heard evidence about sales of the Wharf lots by generations of successor grantors; the record discloses that the deeds to these lots still referenced the First Ebbs Plat. Many of these subsequent conveyances were transfers to Realty or its affiliates. As of April 1981, Newport Oil Corporation, an entity affiliated with Realty, had consolidated the property into common ownership. As of June 1986, Realty had acquired all the property that abuts the streets on the Wharf, except the Harbourview property.

The parties have stipulated that the public has been using the streets and ways on the Wharf for many years.

The evidence also disclosed that the streets on the Wharf have not been taxed by the city—the tax assessor's record reveals that, in 1931, a relatively large portion of the property was removed from the tax rolls as attributable "to roads." The tax assessor testified that, in his opinion, this substantial square footage was subtracted from the land area of the Wharf, "because it became part of a right of way."

The removal of a portion of the property from the tax rolls for streets and roads was not the only act of dominion and control by the city. The evidence disclosed

that the city consistently has exerted governmental authority over the streets on the Wharf. The parties have stipulated that the city posted signage on the streets and that, by ordinance adopted in 1952, North Commercial Wharf was designated a one-way street, forming a one-way loop with South Commercial Wharf. In 1962, the city solicitor determined that North Commercial Wharf was a public thoroughfare. He based his opinion on the longstanding public use of the roadway, the fact that the city continuously had repaired and improved the street, and the 1952 municipal ordinance regulating the flow of traffic. The former director of public works, who served from 1954 to 1984, testified that the city maintained the streets on the Wharf, including snow plowing, and that as the director of public works, he always considered the streets to be public ways.

In 1982, Newport Oil Corporation, an affiliate related to plaintiff, petitioned the City of Newport for abandonment of Scott's Wharf to construct a commercial building across the roadway. The city denied the petition and refused to abandon the wharf. Despite previously acknowledging that Scott's Wharf was a public road, in 1990, plaintiff filed this action, contending the streets were never offered as public ways, and as owner of the lots that abut the rights of way, it now owned the fee as a result of merger.

### The Trial Court Decision

More than five years after the close of evidence, the trial justice issued a written decision in which he determined that the issue to be decided was "the intent and purpose of the trustees of Narragansett Bay Realty [Company] in preparing and recording the [First] Ebbs Plat in 1921." [4] The trial justice did not find the document to be ambiguous; he simply declared that, because there was no direct evidence presented by either party "as to the intent of the developers of the [First] Ebbs Plat," his role was limited to examining "the plats and deeds both before and after the recording of the [First] Ebbs Plat."

The trial justice then referred to the correct principles of law with respect to his role as a fact-finder and acknowledged that this Court's previous decisions required him to examine the First Ebbs Plat to "interpret the meaning of the disputed item by careful scrutiny of all lines, figures, and letters that appear on the map." *Robidoux v. Pelletier,* 120 R.I. 425, 434, 391 A.2d 1150, 1155 (1978). Inexplicably, however, he paid scant attention to this plat. Instead, he rested his decision on the indenture deed that accompanied the Second Ebbs Plat, which was recorded after the lots were deeded-out and sold. The trial justice found the reservation in the indenture deed to be conclusive proof that, when the First Ebbs Plat was recorded, the trustees did not intend to dedicate the roads to the public. Specifically, the trial justice found that the language of the indenture deed "not only negates a public use[,] but it contains specific language limiting its use to the owners of the abutting parcels and their heirs and assignees."

The trial justice found that there had not been an incipient dedication of the

---

4. Although it does not affect our analysis of the issues presented by the Attorney General's appeal, we are particularly troubled by the trial justice's delay in rendering his decision in this matter. The record indicates that the parties in this case presented their evidence to the trial court on July 25–26, 29–30, 1996; October 23–25, 30–31, 1996; December 12, 1996; April 25, 1997; and May 30, 1997. Yet, it was not until December 13, 2002, five and one-half years later, that the trial justice issued his decision in this case. This hindrance of the judicial process is unacceptable.

streets and ways on the Wharf. The trial justice declared: "The concept of proof of dedication by the platter is almost always non-existent, otherwise the word 'incipient' would not be used and a case such as this one would not be brought; thus the [c]ourt must look at indirect evidence of dedication."

In the few references to the First Ebbs Plat in his decision, the trial justice noted that the ways depicted on the plat were designated as wharfs and not as "street[s], road[s], lane[s], driftway[s], by[-]way[s] or any other designation." According to the trial justice, the terms "[s]treet, road [or] highway appear to or imply public usage without restriction," and "[l]ane, alley, [and] driftway have lesser implications." We deem this conclusion incorrect and not consistent with our jurisprudence. *See infra Baker v. Barry*, 22 R.I. 471, 48 A. 795 (1901).

The trial justice also erroneously found that "[t]he wharfs *as laid out* [on the First Ebbs Plat] do not connect with recognized public highways on all sides but lead to dead ends." (Emphasis added.) He concluded that "[t]his appears to deny the concept of public ways."

He also gleaned the intent of the trustees from an examination of subsequent events and recorded documents and entertained parol evidence without a finding that the First Ebbs Plat was ambiguous. This error was compounded by his selective assessment of this evidence. He overlooked and misconceived evidence presented by the state with respect to the tax treatment of the roads, the fact that the city regulated traffic and posted signs on the roads, and the opinion testimony of former city officials.

With respect to no municipal taxation, the trial justice rejected this evidence on the ground that assessing the property "is far too difficult":

"The practical difficulty of achieving a just value is far too difficult, when one looks at the ability of arriving at a fairer result by assessing more salable property and adjusting the rate of taxation to raise the necessary funds to run the government, [it] is far simpler than attempting to value a street and then decid[ing] who to tax."

In his decision, the trial justice also rejected public dedication based on the expense of building and preserving the ways on the Wharf: "Considering the cost of erecting and maintaining those ways, it certainly argues against the idea that in platting the ways the developers were dedicating these ways to the public." He failed to refer to any evidence supporting this finding.

Although he found no incipient dedication of the streets on the Wharf, the trial justice also concluded that if an incipient dedication "might be deemed to exist," there has, nonetheless, "been no acceptance by the government under statutory authority and there is a total lack of evidence of public acceptance." This finding contradicts a stipulation of the parties about the use of the Wharf by the public. Again, the trial justice failed to refer to any record proof supporting this finding.

The trial justice entered final judgment in favor of plaintiff, from which the state filed a timely appeal. Thereafter, Realty moved to dismiss the state's appeal and sought a temporary restraining order to prevent the lower court record in the matter from being transmitted to this Court, arguing that the state did not have standing to enforce rights involving local roads. A justice of the Superior Court denied those motions, and plaintiff filed an appeal. Consequently, both the state's initial appeal and plaintiff's subsequent cross-ap-

peal are before this Court for consideration.

## The State's Standing

Turning first to plaintiff's cross-appeal, we can find no language in our case law to support Realty's contention that the Attorney General, acting on behalf of the State of Rhode Island, lacks standing to challenge on appeal the judgment entered against it by the Superior Court. This Court has recognized that the Attorney General is vested with the authority to maintain suits seeking redress of a public wrong, except in such instances "where one of the public who is injured has a distinct personal legal interest different from that of the public at large * * *." *McCarthy v. McAloon*, 79 R.I. 55, 62, 83 A.2d 75, 78 (1951); *see also Secretary of Administration and Finance v. Attorney General*, 367 Mass. 154, 326 N.E.2d 334, 338 (1975) ("The Attorney General * * * has a common law duty to represent the public interest."); *State v. Boston & M.R. R.*, 75 N.H. 327, 74 A. 542, 547 (1909) ("[I]t is generally recognized that the Attorney General is the proper party to proceedings in equity to restrain public nuisances and kindred wrongs."); *President and Fellows of Middlebury College v. Central Power Corp. of Vermont*, 101 Vt. 325, 143 A. 384, 391 (1928) ("[T]he state, through the Attorney General, is a proper party to maintain and defend the rights of the public * * *."). In this case, the *locus in quo*, namely North Commercial Wharf, Scott's Wharf, and the connector, are significantly incidental to commerce and tourism in the City of Newport. Because Realty seeks a judicial declaration of the private nature of the property, its cause of action thereby implicates the public's interest in the continued use and enjoyment of the land. This alone justifies the Attorney General's involvement in this litigation.

Furthermore, we highlight that the state was a named defendant in Realty's original cause of action in Superior Court. General Laws 1956 § 9–24–1 provides that: "Any party aggrieved by a final judgment, decree, or order of the [S]uperior [C]ourt may, within the time prescribed by applicable procedural rules, appeal to the [S]upreme [C]ourt." Irrespective of plaintiff's rationale for joining the state in its lawsuit, the unambiguous language of § 9–24–1 entitles the state to challenge the adverse judgment before this Court. To accept plaintiff's argument would impermissibly strip the state of that statutorily guaranteed right of appeal in this case. Accordingly, we deny plaintiff's cross-appeal and shall proceed to determine the issues that the state raises in its appeal.

## Standard of Review

The findings of fact made in connection with a jury-waived trial "are entitled to great weight and will not be disturbed on appeal absent a record showing that the trial justice overlooked or misconceived material evidence or was otherwise clearly wrong." *Donnelly v. Cowsill*, 716 A.2d 742, 747 (R.I.1998). However, questions of law and statutory interpretation are reviewed *de novo*. *Webster v. Perrotta*, 774 A.2d 68, 75 (R.I.2001).

## The Law

Although it easily can be accomplished, this Court has recognized that the dedication of land to the public is "an exceptional and unusual method by which a landowner passes to another an interest in his [or her] property." *Robidoux*, 120 R.I. at 433, 391 A.2d at 1154. When a property owner subdivides land and "sells lots with reference to a plat, he [or she] grants easements to the purchasers in the roadways shown on the plat, with or without later dedication of the roadways to the public." *Kotuby v. Robbins*, 721 A.2d 881,

884 (R.I.1998). As between the grantor and grantee, the "sale of a platted lot with reference to the plat will * * * give the latter a right to use all of the streets delineated on the plat even though the plat is unrecorded." *Id.* (quoting *Robidoux*, 120 R.I. at 436, 391 A.2d at 1156). The easement thus created "is appurtenant to the property and passes with the conveyance of the property, unless specifically excluded, even though not mentioned in the deed." *Robidoux*, 120 R.I. at 436, 391 A.2d at 1156.

Whether the streets delineated on the plat are open to the public depends on the owner's intent *at the time the plat is recorded and the lots are sold*. *Robidoux*, 120 R.I. at 434, 391 A.2d at 1155. This Court long has recognized that "the recordation of a plat with streets delineated thereon and lots sold with reference to the plat reveals the owner's intent to offer the streets to the public for use as ways." *Id.* (citing *Volpe v. Marina Parks, Inc.*, 101 R.I. 80, 85, 220 A.2d 525, 529 (1966)). This is recognized in our law as an incipient dedication and is a time-honored method for platting streets and roads and conveying lots with reference to the plat. *Id.* at 433, 391 A.2d at 1154. It is not dependent on subdivision regulations or planning board approval. "[I]n most instances, the filing and the acceptance of a plat plan are sufficient evidence of a landowner's intent to dedicate land for road purposes, particularly in situations in which lots are subsequently sold with reference to the recorded plat." *Donnelly*, 716 A.2d at 748. The second element necessary to establish a dedication of private property is acceptance by the public; this is accomplished in one of two ways: acceptance of the streets by official action or public user. *Robidoux*, 120 R.I. at 433, 391 A.2d at 1154. In this case, this latter element was stipulated in the record, by the parties.

A developer or subsequent owner may not unilaterally revoke the dedication. *Samuel Nardone & Co. v. Bianchi*, 524 A.2d 1114, 1116 (R.I.1987). Once an incipient dedication has been accomplished, but the offer has not yet been accepted by the public, it can be revoked "only by consent of all property owners in the plat * * * or by adverse possession." *Id.* (citing *Marwell Construction Co. v. Mayor and Board of Aldermen of Providence*, 61 R.I. 314, 323, 200 A. 976, 980 (1938), and *Gammons v. Caswell*, 447 A.2d 361, 366 (R.I.1982)).

Because "[t]he recording of a plat or subdivision, which includes streets, constitutes the dedication of such streets to the public," *Catalano v. Woodward*, 617 A.2d 1363, 1368 (R.I.1992) (citing *Gammons*, 447 A.2d at 365), once there has been some form of acceptance, by official action or by public use, the street becomes a public highway. *Id.* (citing *Gammons*, 447 A.2d at 366).

Since the advent of municipal subdivision regulations through legislative enabling authority (P.L. 1945, ch. 1631) municipalities have regulated and restricted the subdivision of property. *E.g., Mill Realty Associates v. Zoning Board of Review of Coventry*, 721 A.2d 887 (R.I.1998). In a traditional subdivision plan, created in accordance with local regulations, "land delineated as streets and roads on a subdivision map becomes public property upon the approval of the [local] plan commission." *Donnelly*, 716 A.2d at 747. Thus, in this circumstance, the dedicatory intent of the owner is established as a matter of law. This, however, is not the only avenue by which a road becomes a public highway.

Although "[i]n certain cases, * * * a recorded plat is all that is needed to disclose a landowner's dedicatory intent," *Robidoux*, 120 R.I. at 434, 391 A.2d at

1155, we also have recognized that application of this "principle to the facts of a given case is not quite as automatic a process" as it may appear. *Id.* In situations in which *"lines and figures drawn on a land-development plat* may be unclear as to their intended purpose," this Court has held that "it is the task of the fact-finder to interpret the meaning of the *disputed item* by careful scrutiny of all lines, figures, and letters *that appear on the map* as well as whatever pertinent evidence may be adduced by the litigants." *Id.* (citing *Volpe,* 101 R.I. at 86, 220 A.2d at 529). (Emphases added.) "Each element of the plat is to be given a meaning, and no part can be considered as superfluous." *Id.* Thus, the first task of the fact-finder is to examine the plat, particularly the lines and declarations that relate to the disputed land, to determine whether this evidence gives rise to a finding of no dedicatory intent or whether it is ambiguous.

 In the absence of a finding that the recorded plat is ambiguous, we know of no authority that permits a trial justice to go beyond the plat and entertain parol or extrinsic evidence to vary the terms of a writing. In *Swanson v. Gillan,* 54 R.I. 382, 384, 173 A. 122, 123 (1934), this Court was confronted with the parol evidence rule as it related to recorded plats and declared that it was "well established that recorded plats are writings and that parol evidence shall not be admitted to vary the same." "Recorded plats are writings that come within the interdictions of the parol evidence rule." *Farrell v. Meadowbrook Corp.,* 111 R.I. 747, 749, 306 A.2d 806, 807 (1973). This rule, however, "presupposes a clearly written unambiguous document." *Id.* Only when a trial justice is confronted with an ambiguity on the face of the recorded plat may he or she allow parol or extrinsic evidence. *Id.*

## Public User

 Additionally, even though an owner makes an incipient dedication by recording a plat with streets and roads and then sells lots with reference to the plat, the dedication must be completed by one of two ways: the municipality must formally accept the offer; or it is accomplished by public user. *Mill Realty Associates,* 721 A.2d at 891. Recently, in *Mill Realty Associates,* this Court reaffirmed the law of incipient dedication of public streets; quoting *Parrillo v. Riccitelli,* 84 R.I. 276, 279, 123 A.2d 248, 249 (1956), we held:

"The law with regard to platted streets and their dedication is well settled in this state. Where a plat is recorded with streets delineated thereon and lots are sold with reference to the plat, there is, so far as the public is concerned, an incipient dedication of such streets. *Brown v. Curran,* [83 A. 515 (R.I.1912)]. To complete such a dedication and establish as public highways the streets that appear on the recorded plat, there must be an acceptance on the part of the public. Such an acceptance may be accomplished by public user or by appropriate action on the part of public authorities. *Brown*[, 83 A. 515]; *Marwell Construction Co.*[, 61 R.I. at 321, 200 A. at 979]." *Mill Realty Associates,* 721 A.2d at 891.

 When there has been no showing of acceptance by the public, this Court has not hesitated to declare that a disputed right of way was not a public road. In such instances, a claim of title by adverse possession can be entertained. *Parrillo,* 84 R.I. at 279, 123 A.2d at 249 (citing *Marwell Construction Co.,* 61 R.I. at 323, 200 A. at 980); *M & B Realty, Inc. v. Duval,* 767 A.2d 60, 64–65 (R.I.2001).

 Therefore, in determining whether a street or roadway has been

offered to the public, a finding of incipient dedication is the first step, and if so, was there acceptance by the public? In this case, however, the latter element, acceptance by the public, is not disputed. Although the trial justice found that there was "a total lack of evidence of public acceptance," in reaching this conclusion, he erred in two distinct ways. First, he overlooked the overwhelming and uncontested evidence of public use of the streets on the Wharf. Second, the record clearly shows that the parties stipulated to this fact. A stipulated fact, agreed upon by counsel "relative to an evidentiary fact or an element of a claim, is conclusive upon the parties and removes the issue from the controversy." *In re McBurney Law Services, Inc.*, 798 A.2d 877, 881–82 (R.I.2002). The stipulated fact "is no longer a question for consideration by the tribunal." *Id.* at 882. The trial justice was obliged to accept this fact as true. Not only did he fail to do so, but the trial justice also ignored the stipulation and erroneously overlooked the abundant evidence of public use and declared that there was no evidence of public acceptance. We vacate this finding as clearly wrong. Accordingly, the second prong of the analysis has been conclusively established, and we shall confine our discussion to the issue of the dedicatory intent of the trustees.

## Merger by Deed

 A final principle, relevant to the issues raised by the parties, is the rule in this jurisdiction that an easement is extinguished by merger when there is unity of title. *Catalano,* 617 A.2d at 1367. Under the doctrine of merger, "when both the dominant and servient estates are vested in one party, the easement is extinguished." *Nunes v. Meadowbrook Development Co.,* 824 A.2d 421, 423 (R.I.2003). The merger doctrine is the basis for plaintiff's claim of ownership of the challenged

roadways, and plaintiff does not dispute that there was a merger of the easements and the fee when the Derbys placed the entire Wharf under unified ownership.

The plat that accompanied the Derby deed was a single parcel of land with existing buildings, but no roadways, set forth on the plat. When the trustees recorded the First Ebbs Plat, they held the entire parcel; the rights of way had merged with the dominant estate. The trustees did not reserve or grant any easements or rights of way in the deeds to the lot owners. The trial justice ignored this evidence and failed to consider whether unity of title destroyed any easements that may have existed before the Wharf properties were assembled into single ownership.

## Incipient Dedication

In a line of cases decided in the nineteenth and early twentieth centuries, before municipal subdivision regulations became governing policy, incipient dedication of roads and highways by platting lots with streets and roads and conveying them with reference to the plat was the recognized method for streets to be opened to the public. The law of incipient dedication is a bedrock principle in our jurisprudence and has never been varied or modified by this Court. Therefore, we reject the trial justice's finding that "proof of dedication by the platter is almost always non-existent" as clearly wrong.

In *Chapin v. Brown,* 15 R.I. 579, 581–82, 10 A. 639, 639 (1887), a bill in equity seeking to restrain the respondent from blocking an unimproved roadway, this Court was confronted with a recorded plat in the town of Tiverton that included North Avenue. The complainant held deeds to a lot within the recorded plat; the deeds referred to the plat, identifying the lot by number and describing North Avenue as bordering the lot. *Id.* at 582–83, 10

A. at 640. The defendant contended that: "said North Avenue was never laid out * * * as a street or way * * * and was never in contemplation of any seller or buyer of any lot in the plat as being in any way appurtenant to lot 31." *Id.* at 582, 10 A. at 640.

This Court held that "when the grantee of a lot so platted purchases it, the existence of the streets as platted * * * operates by way of implied covenant, implied grant, estoppel, or dedication, whichever way of operation may be the truer, to secure to the grantee a right of way over such platted streets." *Id.* at 584, 10 A. at 641. We cited, with approval, a California Supreme Court case, decided in 1852:

"Where lots are sold as fronting on or bounded by a certain space, designated in the conveyance as a street, the use of such space as a street passes as appurtenant to the grant, and vests in the grantee, in common with the public, a right of way over said street." *Id.* at 583, 10 A. at 640 (quoting *Breed v. Cunningham*, 2 Cal. 361 (1852)).

Because North Avenue, as depicted on the plat, was open and unobstructed with access to a public thoroughfare, this Court concluded that "the plat does not indicate any obstruction anywhere in it which would lead a purchaser to suppose that it was intended to be incumbered by gates and fences, from the highway on the east to the highway on the west." *Chapin*, 15 R.I. at 585, 10 A. at 641.

In *Baker*, 22 R.I. at 472, 48 A. at 796, a case similar to this appeal, this Court was confronted with a ten-foot strip of land running between two public streets. Although the strip was not marked as a

street or gangway, a single justice of the Superior Court found that to be the intention of the grantor, who had conveyed his property to a group of trustees, who conveyed a lot as bounded "northerly by a gangway." *Id.* at 472, 48 A. at 796. This Court held:

"Spaces left unmarked on a plat may show a dedication for a street or gangway when taken in connection with declarations of the owner or with user. * * * *Such intent becomes conclusive when embodied in a deed by reference to the space as a gangway or street.* The layout on the plat, the reference to it as a gangway in the deed of the trustees soon after, the continued reference to it in deeds since, and the subsequent use of it give ample proof of the dedication of the strip as a gangway. Had the strip been named as a street, there could have been no question as to its dedication. But the purpose of the strip is just as evident as though the owner had written on it 'This is for a gangway.'" *Id.* (Emphasis added.)

This Court also declared that there was no requirement that the plan contain language "'expressing the * * * purposes of the different spaces and divisions,'" *id.* at 472, 48 A. at 796, if the purpose is apparent or "when it becomes so from subsequent user and reference." *Id.* at 473, 48 A. at 796. Noting that the deeds were from trustees who held the entire tract and "referred to the strip as a gangway," this Court concluded that "this was as effectual a dedication of it as the deed of [the original grantor] would have been." *Id.* at 473, 48 A. at 796.[5]

---

5. In *Baker v. Barry*, 22 R.I. 471, 473, 48 A. 795, 796 (1901), after declaring the gangway in existence based on an incipient dedication by the trustees, this Court nevertheless ruled for the defendant because the plaintiff was not claiming the gangway as a whole but only a five-foot strip "across the defendant's lot to Lemon [S]treet as a footway." Based on proof that the gangway "had been fenced in and appropriated along the center line by the

Accordingly, unless the plat itself, by specific language, broken lines, or other marks, or the deeds indicate otherwise, sale of lots with reference to the plat is an incipient dedication that the roads are offered for public use, pending official action or public user. This was the state of the law in 1921, when the trustees recorded the First Ebbs Plat and proceeded to sell the subdivided lots by reference to the plat.

### No Incipient Dedication

Although this Court has, on occasion, rejected a claim of incipient dedication, it has done so rarely, on narrow grounds, based on the plat itself and not on circumstantial proof or parol evidence adduced decades later. In *Swanson*, 54 R.I. at 383, 173 A. at 123, the trial court allowed oral testimony offered as evidence of the grantor's intent to dedicate a five-foot strip of land for use by all owners on the plat. This Court upheld a decision denying relief because the plat plan contained a designation that the "5 ft. Strip [was] Reserved." *Id.* at 384, 173 A. at 123. We deemed the designation "reserved" on the plat as proof of the owner's intent not to offer the street to the public. *Id.* at 383, 173 A. at 123. We declared that the owner's intent was clear, the plat was not ambiguous, and consideration of parol evidence by the trial justice constituted error. *Id.* at 383–84, 173 A. at 123. "The intention of dedicating the land to public use is contradicted by the very use of the word 'reserved.'" *Id.* at 383, 173 A. at 123. We focused our holding on the language set forth on the plat: "The words '5 ft. Strip Reserved' form a clear and unambiguous statement

of an intention to retain title to such strip of land by the grantor." *Id.* at 384, 173 A. at 123. Finally, this Court rejected the use of parol evidence to establish the grantor's intent because "recorded plats are writings and * * * parol evidence shall not be admitted to vary the same." *Id.* Parol or extrinsic evidence is justified only when a trial justice concludes that the recorded plat is ambiguous about the intent of the developer or the meaning of lines and figures on the development plan. *Farrell*, 111 R.I. at 749, 306 A.2d at 807. Although Realty argues that it has "contended throughout that the [First] Ebbs Plat was ambiguous," the trial justice made no such finding. Rather, he rested his decision on the indenture deed that accompanied the Second Ebbs Plat and selective, but irrelevant, extrinsic evidence of events that occurred well after the First Ebbs Plat was recorded.

In contrast to the holding in *Swanson*, this Court, in *Marwell Construction Co.*, 61 R.I. at 319, 321, 200 A. at 978, 979, rejected the argument that the designation "undivided," which was superimposed over Alvin Street and a single lot in a recorded plat, defeated the claim of incipient dedication. The difference between *Marwell Construction Co.* and *Swanson*, was the depiction of Alvin Street, including the portion in dispute, as open and "one continuous street for its entire length from Reservoir [A]venue to Crescent [S]treet, * * * *there being no lines to shut off said portion.*" *Marwell Construction Co.*, 61 R.I. at 319, 321, 200 A. at 978. (Emphasis added.) Because Alvin Street was open and "one continuous street" and did not

---

adjoining owners," including plaintiff's antecedents, and a portion of the gangway was "inclosed with the rest of the plaintiff's lot," at the time of trial, we concluded that there had been an abandonment. *Id.* "[W]hen it [is] clear that a way was to be used in com-

mon as a whole, and a part of it was appropriated by an owner of one of the dominant tenements, the act of appropriation [is] an abandonment by such owner of his easement in the whole way." *Id.* (citing *Steere v. Tiffany*, 13 R.I. 568 (1882)).

differ from any other street on the plat, this Court concluded that the term "undivided" on the plat in *Marwell Construction Co.* had a very different (and conclusive) meaning than the term "reserved" in *Swanson. Marwell Construction Co.*, 61 R.I. at 321, 200 A. at 979.

As noted, *Swanson* is one of a handful of decisions by this Court in which a single disputed road in a recorded plat was found to be private, as intended by the grantor. The cases of *Patalano v. Duarte*, 68 R.I. 138, 26 A.2d 629 (1942), and *Robidoux v. Pelletier*, 120 R.I. 425, 391 A.2d 1150 (1978), also decided on the basis of the plat plan, are among this limited class of cases. A common factor, relevant to our analysis here, is that except for the case on appeal, we have never been confronted with a claim that *every roadway* in a given plat was private and *none* was offered to the public. Rather, these cases involve a single roadway or a portion of a street or lane that was alleged to be public or private as the case may be; but never has every road in a recorded plat been challenged.

In *Patalano*, 68 R.I. at 138–39, 26 A.2d at 629, a plat described as the "Wilcox Plat" contained streets or avenues delineated on the plat, as well as a strip of land 30 feet wide and 380 feet long, identified as a "Right of Way." *Each end of the right of way was closed by a straight line* drawn across the connecting street. *Id.* at 139, 26 A.2d at 629. This Court rejected the contention that the strip was a public highway because it "was plainly not laid out on the plat as a road or street." *Id.* at 143, 26 A.2d at 631. An examination of the plat clearly revealed that the owners, "by their manner of delineating [the] right of way [on the plat], and by thereafter recording

[the] plat and selling lots with reference thereto," did not "dedicate the land marked 'Right of Way' for a public road or street."[6] *Id.*

The case principally relied upon by Realty and the trial justice, *Robidoux*, 120 R.I. at 430, 391 A.2d at 1152, also rested on an examination of a plat plan—*with broken lines* depicting a strip of land designated as "Hey Road." This dead-end strip of land served but a single lot in the subdivision and *was cut off from the public road at one end and by the lot line of the adjoining lot at the other. Id.* at 428–30, 391 A.2d at 1151–53. This Court, while acknowledging that in certain cases "a recorded plat is all that is needed to disclose a landowner's dedicatory intent," rejected the contention that Hey Road had been dedicated to the public. *Id.* at 434, 391 A.2d at 1155. In situations in which filing the plat and selling lots with reference to the plat is not a sufficient indication of a landowner's intent to dedicate land for road purposes because the "lines and figures drawn on a land-development plat *may be unclear as to their intended purpose*," it is incumbent upon the fact-finder to carefully examine the ambiguous plan and "interpret the meaning of the disputed item by careful scrutiny of *all lines, figures, and letters that appear on the map* as well as whatever pertinent evidence may be adduced by the litigants." *Id.* at 434, 391 A.2d at 1155 (citing *Volpe*, 101 R.I. at 86, 220 A.2d at 529). (Emphases added.) "Each element of the plat is to be given a meaning, and no part can be considered as superfluous." *Id.* Our holding in *Robidoux* was based on how the strip was depicted on the plat—a narrow area situated between broken or

---

**6.** This Court also held that, if any easement existed as appurtenant to the complainants' lot by the designation of "right of way," it was private in nature and was extinguished by the adverse possession on the part of the respondents. *Patalano v. Duarte*, 68 R.I. 138, 143, 26 A.2d 629, 631 (1942).

dotted lines—in contrast to the rest of the roads on the plat, which were wider and depicted by solid lines. *Id.* at 436, 391 A.2d at 1155. Notwithstanding the broad language in *Robidoux,* the holding was narrow, confined to the plat itself, and focused on the different marks and lines on the plat and not on extrinsic evidence or subsequent deeds and development plans.

## Analysis

■ The plaintiff contends that the First Ebbs Plat "was anything but a land-development plat" because the roads already existed. Realty maintains that the purpose of the First Ebbs Plat was not to subdivide the land because the "size and location of the roads and ways shown on the survey corresponded with [that which] existed before the survey." We disagree. In the First Ebbs Plat, the trustees subdivided a single parcel in which the rights of way had merged with the dominant estate. There is no evidence that the lots as created by the trustees existed before the First Ebbs Plat was recorded. The lots were sold with reference to the plat, and unless an examination of the First Ebbs Plat reveals a manifest contrary intent, an incipient dedication of the streets on the Wharf resulted as a matter of law.

The trial justice barely considered the First Ebbs Plat and made erroneous conclusions about the plan. Instead, he concentrated on the indenture deed and found that the indenture deed negated "a public use." He focused on the reservation language of the indenture deed and concluded that this language was determinative of the legal status of every part of every road on the plat, whether or not it was included in the conveyance and without reference to the Second Ebbs Plat. We deem this error.

The state, during the trial of this case, consistently argued that the reservation language contained in the indenture deed only related to the specific parcels described in the document, as outlined on the Second Ebbs Plat. Expert witnesses for both sides agreed with this contention. Phillip Kingman, plaintiff's title attorney, testified as an expert witness and acknowledged that the reservation language in the indenture deed was limited to the strip of land that was part of the land swap, as delineated on the Second Ebbs Plat. The state presented the expert testimony of attorney Alfred Thibodeau, who also opined that the reservation of rights language in the indenture deed was limited to the areas set forth on the Second Ebbs Plat. We agree with this characterization. Although the state vigorously argued this point and presented expert testimony supporting its contentions, the trial justice completely overlooked this evidence.

■ After careful review of this extensive record and the decision of the trial justice, we are satisfied that, by filing the First Ebbs Plat and deeding-out lots with reference to the plat, the trustees made an incipient dedication of the streets and ways to the public. The trial justice failed to examine the First Ebbs Plat to determine whether any "lines and figures drawn on [the plat were] unclear as to their intended purpose." *Robidoux,* 120 R.I. at 434, 391 A.2d at 1155. He, therefore, overlooked and misconceived the material evidence and confused the issues of incipient dedication and dedicatory intent of the grantor. The law is well settled that when confronted with the question of whether a street or roadway has been dedicated to the public, the fact-finder must examine each element of the plat. *Id.*

Finally, having erroneously concluded that "the concept of proof of dedication by the platter is almost always non-existent," the trial justice took another wrong turn by looking to indirect and circumstantial

evidence, including parol and extrinsic evidence, to support his finding of no dedicatory intent by the trustees. *See Farrell,* 111 R.I. at 749, 306 A.2d at 807 ("Recorded plats are writings that come within the interdictions of the parol evidence rule."). This error was compounded by his findings of fact that were clearly wrong.

 In the absence of a finding that the First Ebbs Plat was ambiguous, much of the circumstantial evidence produced by Realty is irrelevant to the issues before us; actions taken or acquiesced in by Realty's predecessors in title are not. *Baker,* 22 R.I. at 472–73, 48 A. at 796. We note that the trial justice disregarded or summarily dismissed evidence presented by the state that related to plaintiff's predecessors in title.

The trial justice summarily rejected the evidence that the roads were never taxed by Newport, based on his belief, unsupported by any record proof, that a fair valuation was too difficult to achieve compared with more substantial ratable property in the community. He also ignored the evidence that the city's tax assessor deliberately withdrew a significant square-foot area from the tax rolls.

We agree with the state that tax-free treatment of the roads on the Wharf was not the result of municipal inertia. The tax assessor's records constitute persuasive circumstantial evidence of affirmative conduct by the city, known to plaintiff's predecessors in title, that reflect the universal understanding that the roads on the Wharf were, indeed, public.

The trial justice also dismissed, without meaningful examination, the state's argument that the city, with the owner's acquiescence, consistently had treated these roadways as public roads. The evidence was undisputed that Newport maintained and repaired the roadways; it plowed snow and regulated traffic—all indicia of public roads. The parties stipulated that the city posted signage on the streets and the fire department exercised jurisdiction over the activities on the Wharf. The trial justice found that the cost of building and maintaining the roads on the Wharf "certainly argues against the idea that in platting the ways the developers were dedicating these ways to the public." However, he failed to point to any record evidence to support this conclusion.

### Dedicatory Intent

 Based on his exiguous treatment of the First Ebbs Plat, the trial justice found that the "wharfs as laid out do not connect with recognized public highways on all sides but lead to dead ends." He concluded that this fact "appears to deny the concept of public ways." This finding is incorrect. As depicted on the First and Second Ebbs Plats, Commercial Wharf and North Commercial Wharf both run from Thames Street to the harbor and, in the case of Scott's Wharf, to its terminus, at the connector. It was only in the Third Ebbs Plat, filed by agreement of the city and lot owners, that the western terminus of Commercial and North Commercial Wharf were changed. We deem this significant to the issues before us today.

Notably, neither the First nor Second Ebbs Plats, nor the deeds-out from the trustees, grant or reserve any rights in the ways on the Wharf. The trial justice's construction of *Greene v. O'Connor,* 18 R.I. 56, 25 A. 692 (1892), also was erroneous. In his decision, the trial justice attempted to distinguish *Greene,* in which the disputed strip of land that terminated at private property was found to be a public highway. *Id.* at 61, 25 A. 692. The trial justice declared that *Greene* rested on a deed restriction that provided, " 'the said strip of land shall be forever kept open and used as a public highway and for no other pur-

pose.'" *Id.* at 57, 25 A. 692. This was error. Contrary to the trial justice's reading of that case, this Court specifically rejected the contention that the deed restriction was determinative of the issue presented. *Id.* at 61, 25 A. 692. The fact that the deed was recorded conclusively established the strip as a highway, and the failure of the City of Providence to keep the road " 'open and used as a public highway' " did not allow the heirs of the grantor to take possession. *Id.* at 57, 61, 25 A. 692. The fact that the strip terminated at private property was of no moment to our decision:

> "[T]here may be a highway where there is no thoroughfare, or passage through, or, in other words, that a road or street closed at one end and which only communicates with a highway at the other may, nevertheless, be a highway." *Id.* at 61, 25 A. 692.

Accordingly, the trial justice misconstrued the holding in *Greene* and erred in applying it to the facts in this case, and his finding that the roads on the First Ebbs Plat did not connect with "recognized public highways" was clearly wrong. The roads depicted on the First and Second Ebbs Plats connect with Thames Street, and the fact that Commercial Wharf and South Commercial Wharf at that time ended at the western terminus of the Wharf— the harbor—is consistent with the purpose of a wharf, to provide access to the waterway.[7]

Lastly, the Third Ebbs Plat did more than simply convey a portion of Commercial Wharf to the city. It was a re-subdivision of the plat, in which the roads on the lot were reconfigured. The city was deeded a *portion* of Commercial Wharf; and this roadway as depicted was altered markedly from the prior plats. Importantly, Commercial Wharf no longer ended at the harbor. The new terminus of Commercial Wharf was set back from the harbor and ended at the parcel leased to the steamboat company; it was set forth on the Third Ebbs Plat *by broken lines* with the designation, *"Limit of Right of Way."* (Emphasis added.) Furthermore, because the Third Ebbs Plat altered the length of Commercial Wharf, the assent of the trustees and the owners was required. *See Samuel Nardone & Co.*, 524 A.2d at 1116 ("[An incipient] dedication can be revoked only by consent of all property owners in the plat * * * or by adverse possession.").

## Conclusion

■ After careful examination of the First Ebbs Plat, we glean no indication that the trustees intended the roads to be private rights of way. There are no lines, markings, or writings on the plat or any language in the deeds that suggest anything other than an incipient dedication,

---

7. Although we deem this evidence irrelevant to our holding, we note that the trial justice also overlooked much of the evidence of public acceptance of the roads produced by the state that tended to show that the streets on the Wharf always were considered public thoroughfares.

The trial justice overlooked the state's partial condemnation of a strip of land in order to construct America's Cup Avenue to run parallel to Thames Street. The city was recognized as the owner of the roadbed and none of the surrounding owners disputed this characterization. Additionally, the city abandoned the most landward portion of North Commercial Wharf, closest to America's Cup Avenue, for the convenience of Realty's predecessor in title.

Moreover, the evidence disclosed that Realty's related affiliates petitioned the city to abandon Scott's Wharf. In the petition, the petitioner acknowledged the city's ownership of the road. The trial justice ignored this evidence, and the state has not suggested that Realty should be estopped from claiming that it owns Scott's Wharf after it filed a petition asking the city to abandon a street it now contends it owned all along.

and through over eight decades of continuous use, the public accepted this offer. The decision of the trial justice is reversed in its entirety.

Finally, by our holding today, we recognize that confusion and uncertainty can arise when a collateral attack is made on the intent of the grantor in depicting streets and roads on a recorded plat. This is of particular concern when a claimant claims to own *every road* on the plat and the proof of ownership does not arise from the plat itself but is based on circumstantial (often irrelevant) evidence, without any finding that the plat or a portion of the plat is ambiguous or even arguably capable of more than one interpretation. Because these cases are expensive and complex, they should be decided in accordance with our settled jurisprudence and should rise or fall by reference to the plat on which the disputed parcel is depicted. Only after a finding that the lines and figures drawn on the development plan "may be unclear as to their intended purpose," *Robidoux*, 120 R.I. at 434, 391 A.2d at 1155, or capable of more than one meaning, should a fact-finder undertake the analysis set forth in *Robidoux* and *Volpe* and "interpret the meaning of the disputed item by careful scrutiny of *all lines, figures, and letters that appear on the map* as well as whatever pertinent evidence may be adduced by the litigants." *Robidoux*, 120 R.I. at 434, 391 A.2d at 1155 (citing *Volpe*, 101 R.I. at 86, 220 A.2d at 529).

Accordingly, for the reasons set forth herein, we vacate the judgment of the Superior Court, to which the papers in this case shall be remanded.

FLAHERTY, Justice, concurring in part and dissenting in part.

I completely agree with the majority with respect to its holding on the standing of the Attorney General, acting on behalf of the citizens of Rhode Island.

However, I respectfully dissent from that portion of the majority opinion which holds that there was an incipient dedication of the wharves in question to public use. I do so because I believe that the majority misinterprets the law applicable to the facts and circumstances of this case and substitutes its judgment for that of the trial justice in a manner contrary to our well-settled standard of review.

As an initial matter, I have reservations about the holding of the majority that the trial justice erred because he did not make a specific finding that the First Ebbs Plat was ambiguous before he considered parol evidence in determining the intent of the trustees regarding the land at issue in this case. In my view, the entire case was litigated on the basis of the ambiguity of the First Ebbs Plat, and both parties presented an abundance of parol evidence to lend circumstantial support to their conflicting interpretations of that original subdivision plat and the intent of the trustees. Indeed, at no point in the lengthy trial before the Superior Court did either party argue that the Ebbs Plat was not ambiguous, nor did either party object to the introduction of parol evidence at any time before the trial justice or on appeal to this Court. To fault the trial justice for failing to make a specific finding on what was a nonissue at trial, and about which neither party seeks review before this Court, seems, to me, to be a victory of form over substance. .

Turning to the merits of the case, I most respectfully disagree with the majority's summation of the law governing dedicatory intent, especially as it applies to the unique circumstances presented in this case. This Court has steadfastly adhered to the principle that "[d]edication of private property to the public is * * * an exceptional and

unusual method by which a landowner passes to another an interest in [land]." *Donnelly v. Cowsill*, 716 A.2d 742, 747 (R.I.1998) (quoting *Robidoux v. Pelletier*, 120 R.I. 425, 433, 391 A.2d 1150, 1154 (1978)); *see also Volpe v. Marina Parks, Inc.*, 101 R.I. 80, 86, 220 A.2d 525, 529 (1966). Our case law provides a cautious, yet very clear framework of the principles governing public dedication of land in this jurisdiction. In Rhode Island, the general rule is that "land delineated as streets and roads on a subdivision map becomes public property upon the approval of [the subdivision arrangement by] the plan commission." *Donnelly*, 716 A.2d at 747 (citing *Town of Bristol v. Castle Construction Co.*, 100 R.I. 135, 139, 211 A.2d 627, 629 (1965)). "In order for this general rule to apply, however, the land [in question] must be clearly marked as a road or a street on the subdivision map." *Id.* When, as in this case, the land is not so marked, the property in question still may be considered public if the proponent can demonstrate that it was "dedicated by its owner as a street or a road and that the public has accepted the dedication." *Id.* (citing *Robidoux*, 120 R.I. at 433, 391 A.2d at 1154; *Vallone v. City of Cranston*, 97 R.I. 248, 255, 197 A.2d 310, 314 (1964)). "In order for there to be an effective dedication, two elements must exist: (1) a manifest intent by the landowner to dedicate the land in question, called an incipient dedication or offer to dedicate; and (2) an acceptance by the public either by public use or by official action to accept the same on behalf of the municipality." *Robidoux*, 120 R.I. at 433, 391 A.2d at 1154. However, we have cautioned that a simple "line or mark on a plat or delineation of a way or street for boundary purposes is insufficient to establish the owner's intent to offer the proper-

ty for [public] dedication." *Donnelly*, 716 A.2d at 747–48.

To determine the intent of a landowner in cases in which the incipient dedication of a parcel of land is unclear or when "the road or way appears to be delineated for boundary purposes only," *Donnelly*, 716 A.2d at 748, it is the task of the trial justice, as fact-finder, to interpret the meaning of the disputed subdivision, plat, or other diagram by a "careful scrutiny of all lines, figures, and letters that appear on the map as well as whatever pertinent evidence may be adduced by the litigants." *Robidoux*, 120 R.I. at 434, 391 A.2d at 1155. In such cases, "[e]ach element of the plat is to be given a meaning, and no part can be considered superfluous." *Id.* However, under no circumstances may the intent to dedicate be lightly presumed by the trial justice. *Volpe*, 101 R.I. at 86, 220 A.2d at 529 (citing *Vallone*, 97 R.I. at 254, 197 A.2d at 314).

Although the majority properly cites the general rule in Rhode Island that land delineated as streets and roads on a subdivision map becomes public property upon the approval of the subdivision arrangement by the plan commission, *Donnelly*, 716 A.2d at 747 (citing *Town of Bristol*, 100 R.I. at 139, 211 A.2d at 629), the majority overlooks our previous holdings indicating that this "presumptive" rule applies only when the land in question is *"clearly marked as a road or a street"* on the subdivision map. *Id.* (Emphasis added.) When, as in this case, the land is not so marked, the property in question may be considered public only if *the proponent can demonstrate* that it was "dedicated by its owner as a street or a road and that the public has accepted the dedication." *Id.* (citing *Robidoux*, 120 R.I. at 433, 391 A.2d at 1154; *Vallone*, 97 R.I. at 255, 197 A.2d at 314).[8] Thus, our case law quite firmly

---

8. The majority concludes that "[a]fter careful examination of the First Ebbs Plat, we glean

places the burden of proof in such cases upon the proponent of the public dedication.

In its decision, however, the majority appears to impose a presumption in favor of the public dedication of the wharves at issue, even though the Ebbs Plat delineates no streets, roads, or other commonly recognized rights of way. Therefore, unless the majority intends to hold that a "wharf," for all intents and purposes, is equivalent to a road, street, highway, or other right of way in the context of a subdivision plat, I am convinced that it has applied an improper presumption in favor of the proponent of the dedication to the facts of this case.

Because it was the burden of the state to establish public dedication in this case to the satisfaction of the trier of fact, it seems to me that the majority's analysis of the trial justice's decision frustrates the standard of review applicable to this case. Under that standard, this Court reviews the findings, judgments, orders, and other rulings of the lower court for mistakes of law, oversight of evidence, and sundry errors, without interposing its own judgment

for that of the lower tribunal. Where a trial justice renders a finding on a question of fact, however, our review is especially constrained. We have held that "[w]hen reviewing findings of fact by a trial justice in a nonjury case, we apply a deferential standard of review." *McEntee v. Davis,* 861 A.2d 459, 462 (R.I.2004) (quoting *Vigneaux v. Carriere,* 845 A.2d 304, 306 (R.I. 2004)). Accordingly, "[t]his Court will not disturb the findings of a trial justice sitting without a jury in a civil matter 'unless such findings are clearly erroneous or unless the trial justice misconceived or overlooked material evidence or unless the decision fails to do substantial justice between the parties.'" *Paradis v. Heritage Loan and Investment Co.,* 701 A.2d 812, 813 (R.I.1997) (mem.) (quoting *Harris v. Town of Lincoln,* 668 A.2d 321, 326 (R.I. 1995)); *see also Gross v. Glazier,* 495 A.2d 672, 673 (R.I.1985); *Lisi v. Marra,* 424 A.2d 1052, 1055 (R.I.1981).[9]

Equally deferential is the standard of review that this Court employs when examining a trial justice's factual determinations concerning dedicatory intent in the very context presented by this case. In

no indication that the trustees intended the roads to be private rights-of-way. There are no lines, markings, or writings on the plat or any language in the deeds that suggest anything other than an incipient dedication and acceptance of the offer by the public through over eight decades of continuous use." However, it is the proponent of the incipient dedication, not the landowner, who bears the burden of proving the facts necessary to establish an incipient dedication. *See* 23 Am.Jur.2d *Dedication* § 72 at 59 (2002) ("When an implied dedication is claimed, the facts relied upon must be such as to clearly indicate a purpose on the part of the owner to abandon his or her personal dominion over the property and to devote it to a definite public use. Proof of intention on the part of the dedicator, and proof of acceptance by the public must be clear and unambiguous.").

9. *See also School Committee of North Providence v. North Providence Federation of Teachers, Local 920,* 468 A.2d 272, 275 (R.I.1983) ("Factual disputes are the sole province of the finder of fact," and a review by the Supreme Court of the manner in which they are resolved is "limited to an examination of the record as it stands"); *Rodriques v. Santos,* 466 A.2d 306, 309 (R.I.1983) (Supreme Court does not, on appeal, consider what evidence should have been accepted and what should have been rejected); *Morinville v. Morinville,* 116 R.I. 507, 516, 359 A.2d 48, 54 (1976) ("[F]actual disputes are to be resolved by the jury, not by an appellate court whose examination is limited to review of the cold record."); *Fournier v. Ward,* 111 R.I. 467, 472, 306 A.2d 802, 805 (1973) (weighing evidence and assessing credibility of the witnesses are the functions of the trial court, not the appellate court).

such circumstances, "inferential findings [of a trial justice], whether positive or negative, will be accepted by us as valid and binding so long as they are reasonable and logical and flow from the established facts. His findings will stand even though another equally reasonable set of inferences might be drawn from the evidence." *Robidoux*, 120 R.I. at 435–36, 391 A.2d at 1155 (citing *Jerry Brown Farm Association v. Kenyon*, 119 R.I. 43, 51, 375 A.2d 964, 968 (1977); *Providence and Worcester Co. v. Exxon Corp.*, 116 R.I. 470, 486, 359 A.2d 329, 338 (1976); *Chase v. Blackstone Distributing Co.*, 110 R.I. 537, 544, 294 A.2d 392, 395–96 (1972)).

In this case, both parties presented voluminous evidence from which the trial justice was called upon to decipher and determine the legal status of North Commercial Wharf, Scott's Wharf, and the unnamed connecting wharf. Included in this evidence were numerous deeds and other documentation in the chain of title for the lots indicated on the original Ebbs Plat, the "Indenture" agreement, and the three Ebbs Plats themselves. Both parties also presented expert testimony explaining and interpreting those documents and records. In addition, the court considered testimony and evidence relating to the tax status of the property at various times, the Newport Police and Fire Departments' treatment of the property, the city's maintenance of each disputed tract of land, and the condemnation award paid to the city by the state in connection with the mid–1970s construction of America's Cup Boulevard. The parties also presented numerous written communications between Newport Oil Corporation and the city regarding the landowner's request that the city abandon Scott's Wharf, including memoranda of Newport's director of redevelopment, city manager, fire chief, and chair of the Planning Board. Also proffered were numerous photographs and tourism guides intended to suggest the public nature of the entire Commercial Wharf area.

After reviewing the record in this case, I see no reason to disturb the Superior Court's decision in this matter. As the trial justice noted, a review of the Ebbs Plat reveals no manifest intent on the part of the trustees or landowners to dedicate the wharves in question to the public. The areas are indeed labeled as "wharves," not as "streets," "roads," or "ways." There are no special delineations or other markings whatsoever from which to suspect an intended establishment of roadways or any other form of public thoroughfare. This analysis applies equally to the second and third Ebbs Plats, which provide no indication whatsoever that the three disputed tracts were intended or considered to be public. In addition, the language of the "reservation" clause in the 1923 "Indenture" agreement suggests that the right of way in the disputed areas was solely intended to be appurtenant to ownership of the individual lots in the subdivision. Lastly, the public dedication of South Commercial Wharf in 1923 strongly suggests that all the wharves on the Ebbs Plat, including the disputed tracts at issue in this case, previously were considered to be private by the trustees and Commercial Wharf landowners at the time of the subdivision. South Commercial Wharf is not distinguished in any manner from the other wharves on the Ebbs Plat; it is reasonable to conclude that each of those wharf areas shared a common designation prior to the public dedication of that southernmost wharf.[10]

I share the majority's appreciation for the rich history of the area that is central to this case, as well as its prominent place among Newport's commercial and tourist attractions. These concerns, however, cannot override the principles of law applicable to this case, nor the established methods by which this Court exercises its

---

10. In my opinion, the trial justice *did* err when he concluded that there was "a total lack of evidence of public acceptance" of the wharves at issue in this case. This error is not material to my analysis, however, because public acceptance is not critical in incipient dedication cases until a dedicatory intent first has been established by satisfactory proof.

duty to review the decisions of a trial justice. For all the above reasons, and with the deepest appreciation for the analysis of the majority, I respectfully dissent from that part of the holding establishing an incipient dedication.

FIRST EBBS PLAT --
EXHIBIT 1

SECOND EBBS PLAT -- EXHIBIT 2

THIRD EBBS PLAT
EXHIBIT 3