DECISION
Before this Court are requests from Plaintiff R. Daniel Prentiss ("Prentiss") and defendant Joanne Cadenazzi ("Cadenazzi"),[1] for a declaratory judgment which will specify what rights each of these City of Newport neighbors has as to a portion of land owned by Prentiss. Also to be decided are Prentiss' claim of trespass and the parties' dispute over the location of two stone pillars and a concrete stairway. Jurisdiction is pursuant the Uniform Declaratory Judgments Act, G.L. 1956 § 9-30-1, et seq.
 FACTS
The following facts were adduced from the testimony and exhibits introduced during trial before this Court.
 THE HISTORY OF EASTNOR COURT
The locus of this dispute is in a residential neighborhood to the south of the commercial heart of the City of Newport. The parcel at issue, known as Eastnor Court, measures 40 feet by 116 feet and abuts the eastern boundary of Cadenazzi's land, as well as the north side of Eastnor Road Extension.[2] The first plat plan showing the area was prepared by Ralph T. Duffy and approved by the City on October 9, 1956. At trial, the plan was referred to as the McCormick subdivision. (Joint Ex. 1.)
The next plat, known as the Mancini Subdivision ("Mancini Subdivision"), is central to this dispute. It was laid out at the direction of owner Joseph D. Mancini, and the corresponding plan was approved by the City on August 22, 1967. (Joint Ex. 4.) The plat plan depicts and describes three lots, numbered 1, 2, and 3. Lot 2 is of no consequence to this litigation. Lot 3,[3]
now owned by Cadenazzi, was the first to be developed by Mancini. The remaining Lot 1, which in its original configuration had some 64,390 ft², contains an area commonly referred to as a panhandle which prevents Lot 1 from being landlocked without street access. The panhandle forms the eastern boundary of Lot 3. It was on Lot 3 that Mancini, in 1967, began constructing a house which he built to face in the direction of the panhandle. Clearly, the manner in which Mancini sited his house and driveway to face the panhandle is conclusive proof that he intended that the panhandle be used as ingress and egress of vehicles associated with the newly built house on Lot 3. This conclusion is not inconsistent with his application for a type I subdivision. (Joint Ex. 2.) Although a type I subdivision does not require the designation of street or roads, Mancini's application expressly notes that the "way" in front of his house be designated "Cowsill Court" in order that he receive mail. (Pl.'s Ex. 1.) Prentiss does not seriously dispute the right of the titled owner of Lot 3 to have vehicular access to Lot 3 by means of travel over the panhandle now called Eastnor Court.[4]
Before Mancini finished construction of the house on Lot 3, he sold it to Manuel and Nancy Braga ("Braga" or "the Bragas"). The warranty deed which reflects the conveyance, dated December 11, 1968, indicates that Lot 3 is a part of the Mancini subdivision, located on Eastnor Road Extension, a public street. In the deed to Braga, Lot 3 is described bounded on the eastern side by a "right of way forty-feet in width," the panhandle previously described. (Joint Ex. 7.)
In 1975, Mancini petitioned the City to reconfigure his subdivision in such a way as to carve off a lot from original Lot 1 to accommodate the creation of a separate lot for a house which had been built on the extreme western side of Lot 1 and which fronted Cowsill Lane/Way — not to be confused with "Cowsill Court," which is the very temporary name given the panhandle. The request was granted by the City conditioned upon the City Engineer's request for an easement to run from Eastnor Road Extension due north to the northern boundary of Lot 1 to accommodate possible access by future developers of landsituated north of the Mancini subdivision. (See Pl.'s Ex. 3, 4, 5.) The plat map for the resubdivision is in evidence as Joint Ex. 10.
In November 1975, Mancini sold to Alexander and Agnes Curtis ("Curtis" or "the Curtises") his remaining interest in the subdivision, conveying by warranty deed the remaining 50,480 ft² of Lot 1. The deed specifically references a boundary with the lot which he had previously conveyed to the Bragas. The bounds of the Mancini to Curtis deed likewise referenced the extreme southern boundary of the land as "turning and running in an easterly direction forty (40) feet along Eastnor Road Extension. . . ." (Joint Ex. 13.) The following year, the Curtises successfully applied for the removal of any non-utility easement over their property because land to the north of Lot 1 was readily accessible by other streets. (Joint Ex. 15; Pl.'s Ex. 7, 8, 9, 10.) Thus, the "40' wide easement" shown on the 1975 plat plan became a nullity after just one year.
Also, at the request of the Curtises, the panhandle portion of Lot 1 was named Eastnor Court. (Joint Ex. 16.) All of this activity preceded ownership of Lot 3 by Cadenazzi, who purchased their property from the Bragas in 1980. (Joint Ex. 17.)
The deed conveying Lot 3, known as 75 Eastnor Road Extension, to Cadenazzi[5] expressly referenced the Mancini Subdivision and stated that the Easterly boundary was "on Eastnor Court, so called, formerly a right-of-way forty (40') feet inwidth to said lot 1, one hundred sixteen (116') feet." (Emphasis added.) Although Cadenazzi testified that she believed she had the right to use Eastnor Court as she wished, just as if it were a street, she likewise conceded that as a result of a conversation — more accurately viewed as a confrontation — with Curtis on the day that she moved in, she and her family never parked on the east side of Eastnor Court. Soon thereafter, Curtis installed railroad ties and loam covered with grass on the east side of Eastnor Court to prevent parking on that side of the panhandle.
In 1984, the lot originally designated Lot 1 of the Mancini subdivision was again the subject of development. Pursuant to the application of Curtis, the lot on which the Curtis home was located was proposed to have a second residence, a duplex, built upon it. As noted on the application, the lot subject to the application for special exception or variance described the lot as having 40 feet of frontage with an area of 50,480 ft². (Pl.'s Ex. 12.) The City permitted the development but insisted that the duplex plan be accompanied by 4 designated parking spaces.
Ten years later, again with City approval, Lot 1 was divided into Parcel A and Parcel B. Parcel A contained the original Curtis home; Parcel B was that land upon which the duplex had been built. (Joint Ex. 17, 18, 20.) In the following year, 1995, the Curtises conveyed the land and improvements on Parcel B to Gene and Elaine Blood. The deed which conveyed the Parcel B and its improvements stated "with the benefit of an easement for access . . . as shown on said plat." (Joint Ex. 21.) That same year Parcel A was conveyed by the Curtises to Bernard and Denise Mansheim ("Mansheim" or "the Mansheims"). The metes and bounds description of the property which was affixed to the warranty deed states in part:
 "Commencing at a point on the northerly side of Eastnor Road extension . . . [and to close the land description] running in a southerly direction One Hundred Sixteen (116') feet to a stone bound located on the northerly side of Eastnor Road Extension, bounded Westerly by land now or formerly of Michael P. Cadenazzi and Joanne Cadenazzi; thence turning and running in an easterly direction Forty feet (40') along Eastnor Road Extension to the point or place of beginning."
(Joint Ex. 2.) The property line survey performed for the Mansheims shows Eastnor Court as being part of the Manheim's' property having a total area of 38,954 ft². (Pl.'s Ex. 15.)
 THE LITIGANTS AS NEIGHBORS
Prentiss purchased Parcel A, formerly the Mansheims' property, from a trust which they had created. The warranty deed to Prentiss describes the land — Parcel A — in metes and bounds similar to the deed which had conveyed the property from Curtis to Mansheim. (Joint Ex. 23.) The total land area is stated to be 38,160 ft², and the description of the land includes the area of the panhandle which abuts Eastnor Road Extension.[6]
Prentiss, an attorney, testified that he took pains to research the title and configuration of the parcel he purchased. Based upon his research in advance of his purchase, he became satisfied that the land he intended to buy was not encumbered by any written easements other than one for utilities. He understood, however, that the panhandle of his property contained an easement by necessity to allow vehicular access to the home now owned by Cadenazzi and the owners of 4/6 Eastnor Court — the duplex.
Some time after he moved into his property in 2002, Prentiss had a conversation with Cadenazzi regarding the use of Eastnor Court. This Court finds that Cadenazzi told Prentiss that her family had originally enjoyed parking on both sides of Eastnor Court. However, Curtis later limited parking to the western side of the panhandle, going so far as to place railroad ties on the eastern side of the panhandle which prevented cars from being parked there. It was likewise from Cadenazzi that Prentiss learned that Curtis had put up the "No Parking" sign at the Eastnor Road Extension boundary to his land. (Pl.'s Ex. 23.)
A precursor to this lawsuit was Prentiss' plan to make substantial improvements to his property in the area known as Eastnor Court. He testified that he planned to remove the paved surface on portions of the panhandle, replacing the old, cracked pavement with a narrower gravel driveway. He then intended to landscape the sides of the driveway, removing railroad ties which Curtis had installed many years earlier on the eastern side of the driveway. Recognizing that Cadenazzi had properly used Eastnor Court for access to their home, and, in his mind, had used Eastnor Court for parking with his tacit permission, Prentiss forwarded a sketch of his intended improvements to Cadenazzi, asking her in writing for her comments and suggestions. (See Ex. A, B.) Prentiss' letter went unanswered.
In the spring of 2003, Prentiss hired a contractor to assist him in making his planned improvements. The old driveway surface was removed and a gravel drive was installed. The railroad ties which Curtis had placed on the eastern side of the drive were removed. Loam was brought in and grass planted on both sides of the new, gravel drive. Access to the Cadenazzi residence was maintained with the installation of a flared entrance to her driveway. Although the grass seed which Prentiss spread began to germinate and grow a lawn on both sides of the drive, Prentiss testified that, on repeated occasions, someone — who he believed to be Joanne and Marissa Cadenazzi — drove over the newly seeded areas in front of Cadenazzi's home. To prevent further disturbance and damage to the newly planted lawn areas, Prentiss placed cinderblocks around the area which was being damaged. When the blocks were subsequently removed from their position, the lawn was again damaged by tire ruts.
Prentiss responded by bringing this lawsuit against the Defendants. However, a hearing in August 2003, with respect to a preliminary injunction which had been sought by the Defendants, resulted in an order from this Court, enjoining Prentiss from making any further alterations to Eastnor Court or interfering with the Defendants' historical use of it. Regardless of any understanding between the parties, this Court finds that Cadenazzi then caused to be constructed a new or improved staircase which connects Eastnor Court to the sidewalk which leads to her home. (See Pl.'s Ex. 20 (a)-(f), 21, 22.) The staircase is larger than that which it replaced and clearly encroaches further onto the panhandle.[7] (Pl.'s Ex. 16.) To counter Cadenazzi's claim that Eastnor Court is a public street and therefore available to her for parking, Prentiss relies on the facts that (1) he pays taxes with respect to the land area of the panhandle, as did his predecessors in title, (2) a privately placed "No Parking" sign alerts the public that Eastnor Court cannot be used for parking, (3) he pays for any snowplowing performed, and (4) the City of Newport does not maintain Eastnor Court, listing it as a private way in its records of streets.
Prentiss likewise relies upon the expert testimony of an experienced real estate attorney, Laurent L. Rousseau, Esq., who opined that after conducting an investigation and inquiry into the title, City records, and use of the land in question, he is of a belief that Eastnor Court is a private way and part of Prentiss' property. Rousseau further opined that the Defendants have no right to park on Prentiss' property other than by permission. However, they do have a right by reason of an easement by necessity to use Eastnor Court for access to their home and driveway. This easement of necessity does not include parking because parking is available on the property owned by Cadenazzi and on Eastnor Road Extension, which abuts the southerly side of Cadenazzi's property. Accordingly, Rousseau opined that parking on the panhandle called Eastnor Court cannot constitute what is reasonably necessary for the enjoyment of Cadenazzi's property — a prerequisite for a finding of easement by necessity.
Cadenazzi testified as length about her long time residence at 75 Eastnor Road Extension, the mailing address associated with lot 3 of the Mancini subdivision. This Court found her testimony to be of questionable accuracy on certain significant points. Cadenazzi testified that from the moment she and her family moved into their home in 1980, they treated Eastnor Court as a public street. Without objection from Curtis, who then owned the property now titled in Prentiss' name, she and her family parked on Eastnor Court. According to Cadenazzi, she had only one confrontation with Curtis, and that was not a "conversation." On the day that she and her family moved in, her father parked his car on the eastern side of the panhandle. Curtis approached her and complained that he had to maneuver his car around the vehicle which had been parked by her father. However, despite her recollection of this obviously unpleasant incident — together with the facts that Curtis thereafter erected a "No Parking" sign near the access to Eastnor Court and went to great lengths to prevent parking on the easterly side of Eastnor Court through the installation of railroad ties — Cadenazzi averred that Curtis had never communicated any limitation on her family's use of Eastnor Court. Her lack of candor on this point and others was significant to the Court.
Cadenazzi testified that around May 2002, she learned that Prentiss had purchased his home. Thereafter, she and Prentiss met at which time she gave him a history of the neighborhood. Some time later, Prentiss came to her door and indicated that he had plans for the area in front of her home and that she was "not to park on the Court." Thereafter, she received from Prentiss a letter which included a sketch of Prentiss' intended plans to alter and landscape Eastnor Court. Frequently resorting to hyperbole, Cadenazzi testified that she thought that Prentiss' actions were provocative and that Prentiss was "aggressive." Her response to Prentiss' letter was through her attorney.
As time progressed into the spring of 2003, Cadenazzi observed that Prentiss caused the old pavement on Eastnor Court to be removed and replaced with a crushed gravel surface. Prentiss was also observed to bring in loam which was placed on the sides of the new drive. The loam was subsequently seeded, and grass grew in the newly seeded areas. The Defendants testified that neither of them drove onto the newly seeded areas until after the August hearing before a justice of this Court.
After the filing of this lawsuit and the hearing which resulted in this Court's order that Prentiss not engage in any "further alterations of any kind to Eastnor Court," Cadenazzi hired a contractor to repair or replace an exterior set of stairs which led from Eastnor Court to the walkway which leads to her front door. (See Ex. C1, C2, C3.) The stairway, at least as rebuilt in late 2003, clearly encroaches onto the panhandle area.
While not claiming any legal title to Eastnor Court, Cadenazzi testified that she believed it to be a public street which she and her family have not only historically used to access their driveway, but also as a place for playing, socializing, and parking. Further, Cadenazzi claims she has made expenditures in terms of repeatedly placing loads of blue shale on that portion of Eastnor Court closest to her home and which in the past was used by her family for parking.[8] She likewise testified that she thought the public nature of Eastnor Court was indicated by the fact that private vehicles made deliveries by use of Eastnor Court, (see Ex. O), that on at least one occasion trash receptacles were placed at the corner of Eastnor Court and East Road Extension, (Ex. D), and the City of Newport filled in a large depression located at the junction of Eastnor Court and Eastnor Road Extension. (Ex. P.)
However, Cadenazzi's claim of unlimited use is largely refuted by her acknowledgement that Curtis had prevented parking on the easterly side of Eastnor Court by installing railroad ties and plantings and that snowplowing was always paid for by Prentiss or his predecessors in title. Even on the two occasions that Cadenazzi hired a snowplowing service to clear portions of Eastnor Court, she forwarded the bill for such service to the Mansheims or Prentiss.
Manuel Braga, the prior owner of the home now occupied by the Defendants, testified as to his purchase of what is now known as 75 Eastnor Road Extension from Joseph Mancini. The house was built by Mancini on Lot 3 of the Mancini subdivision and was the first lot to be conveyed by Mancini. As explained by Braga, the house was built so as to face Eastnor Court. Although the warranty deed conveying the property from Mancini to Braga is tacit on the subject, Mancini told Braga that the panhandle was a right of way for use by the Bragas and those who may purchase the remaining lots to the north. Although there was apparently never a discussion concerning exactly what rights Braga had in addition to the right of passage to his driveway, Braga testified that he believed that he had the right or at least permission to park on the west side of Eastnor Court. He was never told that he could not park there.
Lastly, the Defendants called real estate attorney Donato D'Andrea, Esq. as an expert witness. Attorney D'Andrea testified as to the procedure he employed regarding the formulation of an opinion as to whether or not Eastnor Court was a public street as opposed to a private way and part of Prentiss' property. Recognizing that the inquiry is complete if the plat map clearly reflects the intent of the developer, D'Andrea first examined the Mancini Subdivision. (Joint Ex. 3.) Noting that the panhandle was not "labeled" and was 40 feet wide, the designated width of a city street, D'Andrea proceeded to look at other documents, such as deeds and planning board minutes, to determine the developer's intent. And after researching the series of relevant plat maps, planning board minutes and documents, and, most importantly, deeds, D'Andrea concluded that Eastnor Court was a public street.
D'Andrea's opinion is in large part based upon his conclusion that the warranty deed provided by Mancini to Braga, coupled with the filing of the Mancini subdivision plat which was approved by the City, constitutes at law an offer to dedicate Eastnor Court as a public street and the City's acceptance of such dedication. If D'Andrea's conclusion is correct, the Defendants obviously have the right to use Eastnor Court just like any other public street. This use would include parking.
 THE LEGAL ISSUES
The jury-waived trial focused on the assertions set forth in Prentiss' Amended Complaint, the Defendants' Answer, and the Defendants' Second Amended Counterclaim. These claims can be summarized as follows.
Prentiss claims that he has suffered damages to his property as a result of trespass by the Defendants. He further seeks a declaratory judgment that establishes his fee simple title in the area known as Eastnor Court, free of any encumbrances of the nature of a prescriptive easement, an implied easement or an easement by necessity. In sum, he wishes the judgment to specify that Cadenazzi has no legal rights whatsoever with respect to Eastnor Court. Finally, apparently anticipating that this Court will find at least an easement by necessity with respect to the Cadenazzi's right to travel on Eastnor Court by vehicle to and from her driveway, Prentiss seeks an order that would terminate such easement based upon a claim that Cadenazzi has overused and abused her right of passage.[9]
Requesting this Court to find against Prentiss, Cadenazzi has brought numerous counterclaims. First, Cadenazzi seeks a declaratory judgment that declares her right to utilize Eastnor Court for travel and parking by reason of a prescriptive easement. In what must be viewed as a legal oxymoron, she seeks an order which would both require Prentiss to restore the cracked and ancient paving to Eastnor Court while at the same time be obligated for perpetual "maintenance" of what she considers to be a roadway. Alternatively, Cadenazzi seeks a judgment which declares Eastnor Court to be a public street which was dedicated for public use. In a fallback position, she seeks an order declaring Eastnor Court to be a private street which was dedicated for public use by the original developer. And as a subset to that claim, she seeks an order declaring Eastnor Court to be a private street available to her for travel and parking.
In two additional counts, Cadenazzi seeks an order which declares her right to travel and park on Eastnor Court by operation of an implied easement or by an easement by necessity.
 PRENTISS' TRESPASS CLAIM
The sole colorable claim that Prentiss has against Marissa Cadenazzi is with respect to the claim of trespass. It is Prentiss' contention that both Marissa and Joanne Cadenazzi, the Defendants, have purposefully parked on and damaged his newly planted lawn and allowed — if not encouraged — others to do the same.
Trespass occurs when a person "intentionally and without consent or privilege enters onto another's property." Ferreirav. Strack, 652 A.2d 965, 969 (R.I. 1995) (quoting Black's LawDictionary 1504 (6th ed. 1990)). This Court has carefully considered all of the evidence in the case, including the testimony of Prentiss and the Defendants. Prentiss has no direct evidence that either Joanne or Marissa Cadenazzi intentionally caused harm to his landscaping endeavors or that either encouraged or prompted others to do such injury. At best, Prentiss has proved that the Defendants parked on Eastnor Court after he withdrew his permission to do so. Those acts, if they occurred, resulted in this lawsuit, and the Defendants returned to parking on Eastnor Court only after this Court entered an order preserving the status quo. Accordingly, Prentiss has failed in his attempt to prove trespass and, in particular, any trespass which was accompanied by damages for which the Defendants may be responsible.[10]
 EASTNOR ROAD IS NOT A PUBLIC STREET
Cadenazzi's broadest claim is that she is entitled to travel over, park on and otherwise utilize Eastnor Court because it is a public street, having been dedicated for that purpose by the original developer. This claim is arguably supported by the testimony of Cadenazzi, as well as by her expert witness, attorney D'Andrea, whose opinion at trial was that Eastnor Court is a public street. Prentiss' position is to the contrary and is supported by far more convincing evidence.
In Newport Realty, Inc. v. Lynch, 878 A.2d 1021, 1032 (R.I. 2005) (quoting Kotuby v. Robbins, 721 A.2d 881, 884 (R.I. 1998)), the Rhode Island Supreme Court held that "[w]hen a property owner subdivides land and `sells lots with reference to a plat, he [or she] grants easements to the purchasers in the roadways shown on the plat, with or without later dedication of the roadways to the public." The court went on to state that "the recordation of a plat with streets delineated thereon and lots sold with reference to the plat reveals the owner's intent to offer the streets to the public for use as ways." Id. (quotingVolpe v. Marina Parks, Inc., 101 R.I. 80, 85, 220 A.2d 525, 529
(1966)).
In the case at bar, the evidence is uncontroverted that Mancini sold Lot 3 with reference to the filed and approved Mancini Subdivision. Therefore, if any streets are delineated on the Mancini Subdivision, those streets have been offered to the public for use as ways. Accordingly, the first question before this Court is whether Eastnor Court was delineated a street on the Mancini Subdivision.
In Newport Realty, the court held that "[o]nly after a finding that the lines and figures drawn on the development plan `may be unclear as to their intended purpose' or capable of more than one meaning . . . should a fact-finder `interpret the meaning of the disputed item by careful scrutiny of all lines, figures, and letters that appear on the map as well as whateverpertinent evidence may be adduced by the litigants." Id.
(citations omitted) (emphasis added). As explained in detail by our high Court, "recorded plats are writings and . . . parol evidence shall not be admitted to vary the same." Id. at 1037 (quoting Swanson v. Gillan, 54 R.I. 382, 384, 173 A. 122, 123
(1934)). Thus, this Court cannot look to extrinsic evidence without first finding that the Eastnor Court's purpose, as depicted on the plat, is unclear or capable of more than one interpretation. Contrary to the opinion of attorney D'Andrea, this Court finds no such ambiguity in the original Mancini sub-division plat plan. (Joint Ex. 10).
On the Mancini Subdivision, Lot 1 is depicted as including the panhandle now known as Eastnor Court, giving the property approximately forty feet of frontage on Eastnor Road Extension. The total area of the property is shown as 64,390 ft². Significantly, there are no dashed lines and no unclear lines or figures on the Mancini Subdivision. The only marked right-of-way is for utilities and sewer access. The panhandle, which intersects with Eastnor Road Extension, is closed, marked in a fashion similar to the southern borders of every other lot along that public street. This Court finds, therefore, that the Mancini Subdivision depicts Eastnor Court as part of Lot 1 and nothing more and that, accordingly, Eastnor Court was not depicted as a street in the plat map.
Nor does the subsequently filed plat map, Joint Ex. 10, cause this Court to view the panhandle in any different manner. Cadenazzi's rights to Eastnor Court can be no greater than those conveyed by Braga. Thus, a re-subdivision, subsequent to Braga's acquisition of Lot 3, would not enhance Cadenazzi's bundle of property rights. The 1975 plat plan is similar to the one which had been filed eight years earlier. The differences are that in this reflection of re-subdivision, a lot denoted "lot 2" was carved from Lot 1 so that the owners of a house located in the extreme northwestern part of the subdivision would have their own discreet lot with metes and bounds. The only other notable change is the presence of the verbiage, "40' wide easement," which is drawn in dashed lines from Eastnor Road Extension to the extreme northern boundary of the Mancini subdivision. This designation was not placed there at the request of, or as a reflection of the intent of, the developer to establish a street. Rather it was required by the City of Newport for potential future use for access to land to the north, and was required in order for Mancini to convey what is depicted on the 1975 plat plan as "lot 2." Contrary to the facts in Newport Realty, upon which Cadenazzi relies, there are no indicia of incipient dedication here. The plats contain no designated streets or other markings to suggest a public dedication by the developer for the benefit of land owners in the Mancini subdivision.
It is well-settled that "[o]nly when a trial justice is confronted with an ambiguity on the face of the recorded plat may he or she allow parol or extrinsic evidence." Farrell v.Meadowbrook Corp., 111 R.I. 747, 749, 306 A.2d 806, 807 (1973). Nevertheless, for purposes of discussion and not decision, this Court notes that the historical use or non-use of the panhandle — Eastnor Court — is consistent with the conclusion that it does not constitute a public street. First of all, the City of Newport's registry of streets indicates that it is a private way. Clearly, the intent of former owner Curtis was to maintain such a status. He prevented parking on the entire easterly side of Eastnor Court through the installation of railroad ties and landscaping. He further placed at least one sign at the end of his property facing Eastnor Road Extension which announced "No Parking." Moreover, the City has never maintained Eastnor Court and, to the extent snowplowing has been done, it has always been arranged for or at least paid by the owner of Lot 1.
Perhaps most telling is Cadenazzi's brief but memorable confrontation with Curtis, allegedly on the day on which she and her family moved it to the residence on Lot 3. Regardless of whatever words were utilized in this exchange, the Court concludes that the only reasonable interpretation of Curtis' comments to Cadenazzi was that she could not park on the east side of Eastnor Court. Thus, he was acting in a manner consistent with controlling the panhandle as part of his real property and not acknowledging that it was a public street. Curtis' directive to Cadenazzi that she should not park on the east side of the street was a tacit granting of permission to park on the west side. Accordingly, the historical use of Eastnor Court is anything but consistent with its incipient dedication as a public street. This Court holds that it is not a public street.
 EASTNOR COURT IS NOT A PRIVATE STREET
Cadenazzi claims that if Eastnor Court cannot be viewed as a public street pursuant to a theory of incipient dedication, then it should be regarded as a private right of way which she should be able to utilize. She relies upon Kotuby v. Robbins,721 A.2d 881 (R.I. 1998). Although Kotuby is remarkably similar to the case at hand in many respects, there are significant differences which compel this Court to conclude that the holding in Kotuby
must be distinguished.
The facts in Kotuby involved a sub-division having three lots fronting a busy public street. The center lot of the three, Lot 9, was located primarily behind the other two and was accessible only by means of a thirty-foot wide strip. On the plat map this strip was specifically designated a "private right-of-way" and further labeled as part of Lot 9. Other evidence adduced at trial was an explanation of the planning board's approval of the sub-division which had been contingent upon the right-of-way being dedicated to serve as access to all three of the lots, thereby eliminating the need for three separate driveways. This evidence was augmented by testimony to the effect that the developer had advised the new owners of the two lots without driveways, that the right-of-way was intended to afford street access to all three lots. On these and other facts, our Supreme Court found that the developer had established an easement by implication derived from the notation on the recorded plan of the previously mentioned right of way running from the public street to Lot 9.
The case at bar is distinguishable. The original plat map of the Mancini sub-division, prepared on July 31, 1967, shows no marking for an easement, right of way, street or row. The panhandle depicted thereon is clearly part of Lot 1, which was at that time 64,390 ft² in area. It was on Lot 3 — now the Cadenazzi property — that developer Mancini placed his first home. During the construction phase, Mancini sold Lot 3 and its improvements to the Bragas as reflected by a deed dated December 11, 1968. The deed from Mancini to Braga states the metes and bounds description of Lot 3 on the easterly — panhandle — side as "bounded and described on a right-of-way 40-feet in width to said lot number 1 one hundred (116) feet. . . ." As stated above, the Court finds that the plat plan filed by developer Mancini is clear on its face and not ambiguous.
In this Court's view, the deed from Mancini to Braga corroborates that conclusion and in no way supports Cadenazzi's position. The deed in question reads: "on a right of way forty feet in width to said lot number 1. . . ." A commonsensical reading of this boundary as described in the Braga deed leads to the inescapable conclusion that to the extent there is a right of way, it is for the benefit of lot number 1, not lot number 3.[11] Of course, this Court again notes that Cadenazzi's legal interests in the property can be no greater than that enjoyed by the Bragas, the titled owner from which their property rights originate. Thus, because of the dissimilar manner in which the planning boards approved the relevant plat plans in Kotuby
as opposed to the case at bar, and the markedly different plat plans submitted, this Court must find that here there is insufficient evidence that would establish an easement by implication.
 NO EASEMENT BY PRESCRIPTION
Another claim that Cadenazzi makes is that she should enjoy use of Eastnor Court as a result of a prescriptive easement. As Cadenazzi notes, "one who claims an easement by prescription bears the burden of establishing actual, open, notorious, hostile, and continuous use under a claim of right for at least ten years." Stone v. Greenhill Civic Ass'n, Inc., 786 A.2d 387,389 (R.I. 2001) (citing Palisades Sales Corp. v. Walsh,459 A.2d 933, 936 (R.I. 1983)). Here, of course, there can be no open, notorious and hostile use of Eastnor Court for access to Lot 3 because it was understood from the time that the residence was constructed that access for that lot would be allowed by means of the panhandle. See Tefft v. Reynolds, 43 R.I. 538,542, 113 A. 787, 789 (1921) ("It is the well settled rule that use by express or implied permission or license, no matter how long continued, cannot ripen into an easement by prescription, since one of the elements essential to the acquisition of the easement, namely, user as of right, as distinguished from permissive se, is lacking."). This is fully established by the fact that Joseph Mancini sited the home facing what is now known as Eastnor Court and constructed a driveway so that the utilization of Eastnor Court would be virtually required. It was well understood by the first homeowner, Manual Braga, that he and his family would have access to their home and driveway by means of the panhandle. Likewise, when the Bragas sold to Cadenazzi in 1980, it was clear from the siting of the home, the location of the driveway which intersected the panhandle, and oral representations made to the Cadenazzi by Braga that permission had been given to utilize the panhandle for access to their home and driveway. Even the somewhat bizarre means of communication between Cadenazzi and Mancini's successor in interest, Curtis, would support a finding that the utilization of Eastnor Court by the Cadenazzis for vehicular access to the home was allowed. Just as clearly, because of Curtis' limitation to Cadenazzi relative to parking, permissive limits were placed on Cadenazzi with respect to parking privileges.
Moreover, Cadenazzi has failed to cite a single case in which the right to park on a parcel otherwise allowed to be utilized for vehicular traffic may be acquired under a doctrine of a prescriptive easement. Accordingly, this Court finds that Cadenazzi has failed to prove by clear and convincing evidence that she has acquired a right to park vehicles on the west side of Eastnor Court.
 IMPLIED EASEMENT BY NECESSITY
Thus far, Cadenazzi has failed to prove that she has the right to use Eastnor Court as she pleases. This Court finds, however, that Cadenazzi has proven by clear and convincing evidence that an implied easement by necessity exists in her favor across Eastnor Court and that she, as a result, has an unfettered right to use Eastnor Court to access her property.
In Nunes v. Meadowbrook Dev. Co., 824 A.2d 421, 425 (R.I. 2003) (citing Wiesel v. Smira, 49 R.I. 246, 250, 142 A. 148,150 (1928)), the Rhode Island Supreme Court noted that "[w]hether an easement exists by necessity is a question of fact" and that "the test of necessity is whether the easement is reasonably necessary for the convenient and comfortable enjoyment of the property as it existed when the severance was made." The court added that whether "a substitute could be procured without unreasonable trouble or expense" should be considered as well.Id.
In Kotuby, as in the case at bar, the plaintiffs argued that an implied easement by necessity existed in their favor. TheKotuby Court held that the Kotubys had
 "failed to sustain the burden of proof necessary to establish an easement of necessity over the right-of-way in order to reach [the public street because] [t]here own frontage on this public street would allow them access thereto, even though their convenience would be far better served by the utilization of the right of way as disclosed on the recorded plat."
721 A.2d at 883.
With respect to this issue, however, the facts in Kotuby are again distinguishable from those in the case at bar. Here, even though Lot 3, too, fronts on a public street, this Court is persuaded that the easement was reasonably necessary for the convenient and comfortable enjoyment of the property as it existed when the severance was made and, moreover, that it remains so now.
In Kotuby, the easement was not necessitated by the orientation of the property or its terrain but by the planning board's concern, apparently, over traffic congestion. The decision to site the house on Lot 19 was made by the purchasers of the lot, not its developer, and the decision was based not on necessity, but on preference. In the instant case, Mancini, the developer, sited the house on Lot 3 so that the house and driveway faced Eastnor Court. Furthermore, the land on Lot 3 features a significant downward slope from west to east.
In theory, Cadenazzi could install a new driveway connecting her property directly to Eastnor Road Extension. Cadenazzi, however, would no longer be able to access her original driveway or her garage as both are located on the side of her house farthest from Eastnor Road Extension. To now require Cadenazzi to install a new driveway would cause unreasonable trouble and expense, especially since Mancini clearly intended the owner of Lot 3 to be able to access his property via Eastnor Court. Seeid. This Court finds, therefore, that Cadenazzi has the right to use Eastnor Court to access her property.
Cadenazzi, however, does not have the right to park on Eastnor Court without Prentiss' permission. This Court finds that the availability of parking on Eastnor Court is not and has never been reasonably necessary for the convenient and comfortable enjoyment of the home on Lot 3. Cadenazzi's home has a garage and driveway that can accommodate at least two vehicles. Furthermore, proper and lawful parking on Eastnor Road Extension — the road running along the southern border of Lot 3 — is available fewer than 100 feet from the front door to Cadenazzi's home. Accordingly, Cadenazzi has an easement implied by necessity that entitles her to pass over but not park on Eastnor Court.
 STONE PILLARS AND CONCRETE STAIRS
The evidence at trial showed that in all likelihood, developer Joseph Mancini was responsible for erecting stone pillars on either side of the driveway access to the home now owned by Cadenazzi long before 1980. Whether the pillars represent structures which were erected by the owner of both Lots 1 and 3 prior to the sale of Lot 3 to Manual Braga, or whether the pillars represent a de minimus encroachment on Lot 1 by the Bragas many years ago and, thus, constitute a taking of title through adverse possession, matters little. Prentiss in no way seeks the removal of the pillars so long as they are not modified or enlarged. Accordingly, this Court holds that the land on which the stone pillars stand constitutes property of the titled owner to Lot 3, presently Cadenazzi.
The newly installed concrete stairs leading from the lawn area of the Cadenazzi residence to Eastnor Court creates a substantially more serious problem. The evidence is uncontroverted that the steps as repaired and, this Court finds, enlarged, were built subsequent to the August, 2003 preliminary hearing in this matter. Although the order entered by the Justice who presided over the motion for preliminary injunction is tacit as to the subject, it is quite clear to this Court that the Justice who presided over that hearing intended that the parties maintain the status quo. Apparently relying upon a preliminary ruling which had assisted her cause, Cadenazzi took advantage of that order and repaired and substantially enlarged her stairway. Cadenazzi now seeks the protection of this Court, claiming that it would be an undue financial burden to undo what she did during the pendency of this litigation.
As Prentiss notes, one who undertakes a construction endeavor in the face of a potential court order, ruling such construction to be improper, does so at his or her own risk. SeeRenaissance Dev. Corp. v. Universal Properties Group, Inc.821 A.2d 233, 238 (R.I. 2003). Uncontroverted evidence developed during trial amply proved that the new staircase encroaches onto Eastnor Court by two to three feet more than did the prior staircase. Counsel for Prentiss has represented — and Cadenazzi has not denied — that the steps were installed despite an express request by Prentiss that pending trial there be no alteration to the terrain. This request was acknowledged and agreed to by Cadenazzi's counsel prior to the stair reconstruction.
Only brief reference needs to be made to ancient maxims of equity: "He who seeks equity must do equity." Raposa v. Guay,84 R.I. 436, 441, 125 A.2d 113, 115 (1956). And, those who seek equity must come before the court with "clean hands." K-MartCorp. v. Oriental Plaza, Inc., 875 F.2d 907, 912 (1st Cir. 1989). Cadenazzi has done neither.
Accordingly, the judgment to be entered shall require that Cadenazzi remove the concrete stairs. Obviously they may be replaced by stairs located on Cadenazzi's lot.
Counsel shall prepare a judgment in conformity with the rulings contained herein.
[1] Defendant Marissa Cadenzazzi is not a party to the declaratory judgment action. She is a defendant solely as to Prentiss' claim for trespass.
[2] Sadly, the testimony at trial reflected great animosity between the parties. They have elected to have this Court decide issues which this Court believes would have been much better resolved through negotiation, compromise, and neighborliness.
[3] Lot 3 is Lot 311 of Newport Tax Assessor's Plat 41.
[4] But see infra note 8.
[5] Cadenazzi originally acquired title with her then husband. She is now apparently sole owner, having divorced.
[6] Prentiss' land is Lot 244, Newport Tax Assessors Plat 46.
[7] Stone pillars which are located on each side of the driveway appear to encroach onto Eastnor Court. Prentiss does not object to the placement of the stone pillars as currently located.
[8] Cadenazzi produced no supporting documents which reflected deliveries of blue shale.
[9] Prentiss argues that Cadenazzi should be found to have forfeited her right of ingress and egress due to undue burden. There being no evidence to support such a harsh remedy, it is denied.
[10] Encroachment issues related to stone pillars and the newly installed concrete stairway are discussed below.
[11] From a purist legal point of view, Lot 1 did not need an expressly designated right-of-way. The 40' strip was a part of Lot 1. However, unfortunate wording which describes purported rights to land not the subject of the deed cannot by inference convey rights to the land subject to the conveyance.